**UNITED STATES of America,**

v.

**Justin VOLPE, Defendant.**

**No. 98 CR 196.**

United States District Court,
E.D. New York.

Dec. 13, 1999.

Loretta E. Lynch, United States Attorney, Eastern District of New York, Brooklyn, NY, Alan Vinegrad, Assistant United States Attorney, of counsel.

Marvyn M. Kornberg, Kew Gardens, NY, for defendant.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

On May 25, 1999 the defendant, Justin Volpe, pleaded guilty to six counts of a twelve count indictment.

The Court is required to sentence Volpe under the United States Sentencing Guidelines ("the Guidelines") as set forth by the United States Sentencing Commission ("the Commission") in the Guidelines Manual effective November 1, 1998.

In a Presentence Investigative Report dated August 13, 1999 (the "Presentence Report"), the United States Probation Department calculated Volpe's offense level under the Guidelines. Volpe objects to several portions of that report. The Court now sets forth a memorandum and order embodying its findings and conclusions as to Volpe's sentence.

### I.

The record is more than adequate to support findings of fact as follows.

At approximately 4:00 a.m. on August 9, 1997, New York City Police Officers from the 70th Precinct were summoned to Club Rendez–Vous, a nightclub located on Flatbush Avenue in Brooklyn, New York. Among them were Officers Justin Volpe, Thomas Bruder, Charles Schwarz, and Thomas Wiese, and Sergeant Michael Bellomo.

The officers attempted to disperse a large crowd that had gathered outside the club to watch a fight between two patrons. As the officers tried to push and urge the crowd away from the club, several of those gathered on the street became unruly, yelling and throwing bottles at the officers. During the fracas, Volpe struggled with an intoxicated patron named John Rejouis and eventually pushed Rejouis to the ground. Rejouis held up his badge as a New York City Corrections Officer. Volpe slapped Rejouis's hand and knocked the badge to the ground.

Shortly thereafter, Abner Louima confronted Volpe and began yelling at him regarding his treatment of Rejouis. Volpe attempted to push Louima away from the club, but Louima refused to move and the confrontation escalated. As Schwarz, Wiese and other officers approached and tried to handcuff Louima, Volpe was struck hard on the side of his head and knocked to the ground. Volpe thought Louima had hit him. In fact, Jay Nicholas, Louima's cousin, struck Volpe and then fled.

Officers who had seen Nicholas strike Volpe began chasing Nicholas up Flatbush Avenue. Volpe joined the chase, thinking he was in pursuit of Louima. During the chase Volpe encountered Patrick Antoine, an individual who had not been at the club and was simply on his way home. Volpe yelled at Antoine and began beating him, using a flashlight to strike his head and face. Antoine suffered bruises and contusions on his head and a laceration over his right eye that required seven stitches. Several other officers then arrived and placed Antoine under arrest.

Later on the morning of August 9, 1999, Volpe provided false information to Assistant Kings County District Attorney Sheila O'Rourke regarding his assault on Antoine. He told O'Rourke that while he was attempting to place Louima in handcuffs, Antoine pushed and punched him and refused to be handcuffed. Volpe also swore out a complaint attesting to these facts and charging Antoine with felony assault, obstructing government administration in the second degree, and disorderly conduct.

Meanwhile, Schwarz and Wiese had placed Louima in custody following his encounter with Volpe. They were driving Louima to the 70th Precinct in their patrol car when Sergeant Bellomo broadcast a description of the man who had assaulted Volpe. Although he was not the assailant, Louima matched the description. Louima testified that the driver of the patrol car stopped in the vicinity of Nostrand Avenue and Glenwood Road, with Louima sitting

in handcuffs in the back of the car. Louima further testified that both officers got out of the car, opened the rear door and began to beat him about the body and head, at least once with an unidentified hard object, inflicting contusions and bruises.

Schwarz and Wiese then drove to Glenwood Road and Bedford Avenue, where they radioed Bellomo that they had in custody a suspect in the assault on Volpe. Volpe and his partner, Thomas Bruder, overheard this and drove to Glenwood Road and Bedford Avenue. Upon arrival and after a brief conversation with the other officers present, Volpe approached Louima, who was still in handcuffs in the back of the patrol car. Volpe taunted Louima and beat him on his head and face with a closed fist and a radio. Louima sustained lacerations and abrasions on his face and swelling in his mouth and around his eye.

Schwarz and Wiese then drove Louima to the 70th Precinct and presented him to Sergeant Jeffrey Fallon at the front desk. Schwarz and Fallon began filling out paperwork regarding Louima. Louima was still in handcuffs, and while he was being processed his pants and underwear fell to his ankles.

Volpe arrived at the precinct shortly after Schwarz. He saw Louima at the front desk, then walked to the juvenile questioning room, where he grabbed a wooden broom stick and broke it over his knee. He placed the bottom of the stick behind a locker, took the upper section to the bathroom and put it behind a garbage can. Volpe then left the bathroom and walked to the front desk, where Schwarz and Fallon were still processing Louima. Volpe borrowed a pair of leather gloves from Officer Mark Schofield, who was standing near the front desk.

Louima testified that when Fallon finished processing him, the driver of the car in which he was transported to the precinct grabbed him by the handcuffs and took him to the bathroom, his pants and underwear still around his ankles, forcing him to shuffle-step, and opened the door to the bathroom and took Louima inside, with Volpe following.

Volpe then picked up the stick he had put behind the garbage can and told Louima, "I'm going to do something to you. If you yell or make any noise, I'll kill you." Volpe pushed Louima to the ground, with his head near a toilet bowl, and kicked him in the groin. When Louima began screaming, Volpe put his foot over Louima's mouth. Louima testified that the two officers began to punch him about the head and body, and that the driver of the car then grabbed Louima by his handcuffs and lifted him from the ground.

Volpe then forced the broken broomstick approximately six inches into Louima's rectum. He removed the stick, which was covered with Louima's feces, and held it in front of Louima's mouth and taunted him. Volpe then slammed the stick against the wall, leaving behind traces of feces.

With Louima crying and in severe pain, Volpe lifted him to his feet and took him to a holding cell, leaving Louima's pants and underwear around his ankles. Before putting him in the cell, Volpe told Louima that if he told anybody what had happened, Volpe would kill him. Volpe then returned the leather gloves, now covered with Louima's blood, to Schofield.

Volpe later encountered Louima sitting on a chair outside his cell waiting to be taken to the hospital. Volpe cursed at Louima, pulled the chair away from him, and told him to return to the cell and get down on his knees.

Several of the officers involved in the events outside the nightclub, including Volpe, went to the New York Community Hospital on the morning of August 9, 1999, to be treated for minor injuries sustained during those events. At the hospital, Volpe was overheard telling fellow officers that "I broke a man down." Volpe later returned to the 70th Precinct, where he

told Sergeant Kenneth Wernick what he had done to Louima, saying "I took a man down tonight." Volpe took Wernick to the bathroom and showed him the stick used in the sexual assault, which Volpe had left in the bathroom. Shortly thereafter, Volpe showed the stick to Officer Michael Schoer. Smelling Louima's feces on the stick, Schoer said, "What is that, dog shit?" Volpe responded, "No, human shit." Volpe subsequently threw the broom handle into a trash bin outside the precinct.

Approximately four hours after the bathroom assault, Louima and Antoine were taken to Coney Island Hospital in Brooklyn, New York. Antoine received seven stitches to close the laceration on his head and was discharged later that day. Louima was initially diagnosed with swelling in his head and a laceration over his eye, but further tests showed internal injuries to his bladder and rectum. On the evening of August 9, 1997, doctors surgically repaired a two-centimeter perforation to Louima's rectum and a three-centimeter perforation to his bladder. Doctors also performed colostomy and cystostomy procedures.

Louima remained hospitalized until October 10, 1997. Among the complications he suffered was an intestinal blockage requiring emergency surgery and the implantation of a colostomy bag. Louima underwent surgery again in February 1998 to remove the colostomy bag. After his release from the hospital on October 10, 1997, Louima received medical and psychiatric treatment on an outpatient basis and continued to suffer severe headaches, abdominal pain and insomnia.

On August 10, 1997, the Internal Affairs Bureau of the New York City Police Department began an investigation into the events at the 70th Precinct. That evening, Internal Affairs inspectors interviewed Louima at the Coney Island Hospital, and on August 11, 1997, they arrived at the 70th Precinct to collect evidence.

Volpe was arrested and charged with the assault on August 13, 1997. The Kings County District Attorney's office agreed to dismiss the state charges in lieu of this federal prosecution. On February 26, 1998, Volpe and Schwarz surrendered to the Federal Bureau of Investigation.

A federal indictment was issued on February 26, 1998, and the superceding federal indictment on which Volpe was tried was issued March 3, 1999. Jury selection began on April 14, 1999, and the trial itself on May 4, 1999. On May 25, 1999, three days before the scheduled close of the government's case in chief, Volpe pleaded guilty to six of the twelve counts in the superceding indictment: (1) conspiring to deprive Abner Louima of his civil rights by aggravated assault (denominated Count IA in the superceding indictment) and aggravated sexual abuse (Count IB); (2) assaulting Louima in a police car (Count III); (3) sexually abusing Louima in a restroom at the 70th Precinct (Count IV); (4) assaulting Patrick Antoine (Count VII); (5) falsely arresting Antoine (Count VIII); and (6) witness tampering (Count IX).

## II.

In its Presentence Report, the Probation Department calculated a total offense level under the Guidelines of forty-six for all counts against Volpe. The sentence prescribed by the Guidelines for any offense level at or above forty-three is imprisonment for life. *See* U.S.S.G., Ch. 5, Pt. A.

For the reasons hereafter recited, the Court finds Volpe's total offense level to be forty-two and imposes a sentence of 360 months imprisonment. The Court also imposes a five-year term of supervised release, and as a special condition a prohibition on possession of a firearm. The Court also imposes a special assessment of $525.00; restitution to Louima in the amount of $277,495.09; and restitution to Antoine in the amount of $3,550.27.

The details of the Court's computation of the sentence appear in an appendix to the Court's memorandum and order.

The logical and practical place to start in describing the applicable Guidelines and Volpe's objection to the calculation by the Probation Department is with Counts IB and IV. These charge a conspiracy to deprive and the depravation of Louima's civil rights by criminal sexual abuse. The applicable Guidelines level for these two counts determines the adjusted offense level applicable to any sentence of Volpe. Neither of the two counts relating to Antoine figure in the analysis, nor do any of the other counts relating to Louima, namely counts IA, III, IX.

Since Counts IB and IV are treated as one the Court will refer to them as charging aggravated sexual abuse and analyze each objection made by Volpe to the calculation of the Probation Department.

## III

The so-called base offense level for the crime of depravation of civil rights by aggravated sexual abuse is 27, to which the Probation Department added various adjustments objected to by Volpe. Volpe also objected to a failure to apply one downward adjustment and several downward departures from the total offense level.

## A

■ The Presentence Report includes a two-level upward adjustment to the base offense level pursuant to § 3C1.1 of the Sentencing Guidelines for obstruction of justice consisting of Volpe's threatening to kill Louima if he revealed what was done to him. For the reasons that follow, the Court deems this upward adjustment unjustified.

Obstruction of justice is typically governed by § 2J1.2 of the Guidelines. Application Note 3 to that section states that if a defendant is "convicted under this section [relating to obstruction of justice] as well as for the underlying offense (i.e., the offense that is the object of the obstruction), see the Commentary to Chapter

Three, Part C (Obstruction), and to § 3D1.2(c) (Groups of Closely Related Counts)."

Section 3C1.1 provides for a two-point upward adjustment if the defendant obstructed justice "during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." Application Note 1 to § 3C1.1 states in pertinent part that

[t]his adjustment applies if the defendant's obstructive conduct (A) *occurred during* the course of the investigation, prosecution, or sentencing of the defendant's instant offense of conviction . . . . (emphasis added).

The Sentencing Commission added this language to Application Note 1 in amendments that became effective November 1, 1998. U.S.S.G., Supp. to App. C, Amend. 581 (1998). The prior version of the commentary made no reference to the timing of the obstructive conduct. In commentary accompanying the 1998 amendment, the Commission stated that the changed language "clarifies the temporal element of the obstruction guideline (i.e., that the obstructive conduct *must occur during* the investigation, prosecution, or sentencing of the defendant's offense of conviction)." *Id.* (emphasis added).

The court must use the Guidelines Manual, including the commentary and application notes, "in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11; *see Stinson v. United States*, 508 U.S. 36, 40, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). The manual in effect today, the day of sentence, is that which went into effect on November 1, 1998. Thus, the court could apply the two-level adjustment of § 3C1.1 only if Volpe's obstruction occurred during the investigation, prosecution, or sentencing of Volpe. *See* U.S.S.G. § 3C1.1; *United States v. Hutchinson*, No. 98–1654, 1999 WL 357837, at *1 (2d Cir., May 20, 1999) (directing district court on remand to apply § 3C1.1 adjustment only where there has been "a specific finding as to when the

investigation of the offense of conviction began"). There is no evidence that Volpe's obstruction occurred during any pertinent investigation, prosecution, or sentencing. Hence, the Court may not apply the adjustment.

A majority of courts to have considered the issue have held that § 3C1.1 does not apply to pre-investigation conduct. *See Hutchinson,* 1999 WL 357837, at *1; *United States v. Clayton,* 172 F.3d 347, 353–56 (5th Cir.1999); *United States v. Self,* 132 F.3d 1039, 1042–43 (4th Cir.1997); *United States v. Gacnik,* 50 F.3d 848, 852 (10th Cir.1995); *United States v. Emery,* 991 F.2d 907, 912 and n. 6 (1st Cir.1993) (dictum); *United States v. Kirkland,* 985 F.2d 535, 537–38 (11th Cir.1993).

■ In *United States v. Irabor,* 894 F.2d 554, 556 (2d Cir.1990), the Second Circuit applied the pre–1998 version of the Guidelines and found no indication of "congressional intent to limit its application to conduct occurring after the initiation of proceedings." *Irabor* was, of course, decided long before the 1998 amendments to the commentary to § 3C1.1. Those amendments supercede any conflicting court interpretation. *See Stinson,* 508 U.S. at 46, 113 S.Ct. at 1919 ("amended commentary is binding on the federal courts"); *United States v. Clayton,* 172 F.3d 347, 355 (5th Cir.1999) (amendment to § 3C1.1, Application Note 1 "takes precedent over prior conflicting judicial interpretations").

■ The Government argues that the language of Application Note 8 to § 3C1.1 requires an adjustment. That note states:

[i]f the defendant is convicted of both an obstruction offense ... and an underlying offense ..., the count for the obstruction offense will be grouped with the count for the underlying offense under [§ 3D1.2(c) ]. The offense level for that group of closely related counts will be the offense level for the underlying offense increased by the two-level adjustment specified by this section, or the

offense level for the obstruction offense, whichever is greater.

U.S.S.G. § 3C1.1, comment. (n. 8).

Volpe was convicted of both an obstruction offense (witness tampering) and the underlying offense (criminal sexual abuse). Those two counts were grouped together for purposes of determining the adjusted offense level under the Guidelines. *See* U.S.S.G. § 3D1.2(b). But the Government argues that, in addition to grouping the obstruction and sexual abuse counts together, the Court should adjust the resulting offense level upward by two levels pursuant to Application Note 8 to § 3C1.1. *See United States v. Maggi,* 44 F.3d 478 (7th Cir.1995) (§ 3C1.1 adjustment was proper where obstruction count was grouped with underlying money laundering count).

Application Note 8 requires that an obstruction count be grouped with the underlying offense pursuant to § 3D1.2(c) and the adjustment applied accordingly. Section 3D1.2(c), in turn, applies "[w]hen one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the applicable guideline of another of the counts." Witness tampering is not an offense characteristic in the sexual assault guideline. *Cf. Maggi,* 44 F.3d at 481 (adjustment pursuant to §§ 3D1.2 and 3C1.1 was proper where "the money laundering count embodie[d] elements of obstruction of justice"). The only relevant "other adjustment" to the sexual assault guideline is § 3C1.1 itself, which, as discussed, does not apply to Volpe's conduct. Thus, Application Note 8 to § 3C1.1 does not require an adjustment under the facts of this case.

■ Even if the language of Application Note 8 were read to conflict with the guideline itself, the guideline, as interpreted by the Sentencing Commission, is controlling. *See Stinson v. United States,* 508 U.S. 36, 43, 113 S.Ct. 1913, 1918, 123 L.Ed.2d 598 (1993) (where commentary and guideline are inconsistent, "the Sentencing Reform Act itself commands com-

pliance with the guideline") (*citing* 18 U.S.C. § 3553(a)(4), (b)). Section 3C1.1, clearly explained by the Sentencing Commission and interpreted by the Second Circuit, bars application of the two-level adjustment for obstruction of justice under the facts of this case.

## B

■ Volpe next argues that his acceptance of responsibility entitles him to a two-level downward adjustment. Section 3E1.1 of the Guidelines provides for an adjustment where "the defendant clearly demonstrates acceptance of responsibility for his offense." Application Note 1 provides a non-exclusive list of factors for the Court to consider in determining whether a defendant qualifies for this adjustment. They are: truthfully admitting the conduct offense; voluntarily terminating criminal conduct or associations; voluntarily paying restitution; voluntarily surrendering to authorities; voluntarily assisting the authorities in recovering fruits and instrumentalities of the offense; voluntarily resigning his office or position; post-offense rehabilitation; and the timeliness of the defendant's conduct. *See* U.S.S.G. § 3E1.1, comment. (n. 1).

Volpe identifies two ways in which he has purportedly accepted responsibility. First, he says he truthfully admitted to his conduct and acknowledged its wrongfulness in his guilty plea and his statement to the Probation Department. Second, he claims to have sought to "right a most significant injustice" by stating that Schwarz was not involved in the bathroom assault on Louima but Wiese was—a statement not yet tested by cross-examination.

Neither of these arguments evince an acceptance of responsibility. Volpe's statements to the Probation Department are evasive and even inaccurate in some respects and show an overall reluctance to face up to the extent of his crime. For example, in describing his sexual abuse of Louima since pleading guilty, Volpe has minimized the brutality of his acts, stating

that "the next thing I know, the stick was in [Louima's rectum]," "I put pressure on the stick and it went in," and "the stick just seemed to pop in." In fact, Volpe rammed the stick into Louima with enough force to puncture his rectum and bladder and leave him hospitalized for two months.

Volpe's purported acceptance of responsibility was also belated, coming shortly before the completion of the Government's *prima facie* case at trial. *See* U.S.S.G. § 3E1.1, comment. (n. 2) (adjustment is not available to defendant who "puts the government to its burden of proof at trial . . ., is convicted, and only then admits guilt and expresses remorse"); *cf. id.,* comment. (n. 3) (guilty plea and truthful admission *"prior to the commencement of trial* . . . constitute significant evidence of acceptance of responsibility") (emphasis added). "[E]xercising the constitutional right to trial does not, of course, preclude receiving an acceptance reduction." *United States v. Ibanez,* 924 F.2d 427, 428–29 (2d Cir.1991). But "a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct." U.S.S.G. § 3E1.1, comment. (n. 2). Thus, belated pleas will justify the adjustment only "in rare situations." *Id.* Volpe's "last-minute expression of remorse" appears to have been "motivated by self interest rather than genuine contrition." *United States v. Charria,* 919 F.2d 842, 849 (2d Cir.1990) (citations omitted).

Indeed, before entering his plea, Volpe not only denied guilt and put the government to its burden but also hinted, quite fallaciously, both through his attorney's opening statement and in press interviews, that Louima sustained his injuries during a consensual sexual encounter with another man. Volpe's subsequent guilty plea cannot erase the effect of such an effort to avoid conviction.

Volpe's efforts to exonerate Schwarz and inculpate Wiese also fails to earn him an adjustment. Even if the Court were to

assume his statements were true, the Court cannot grant credit for them under § 3E1.1. Volpe's counsel first offered these statements to the Government as part of a proposed plea agreement, which the Government rejected. This last-minute effort to diminish his sentence through a cooperation agreement, coming just days before his guilty plea, cannot be considered an "acceptance of responsibility" for his own conduct. It is fair to infer that, like his plea, his attempts to cooperate were likely "motivated by self interest rather than genuine contrition." *Charria,* 919 F.2d at 849.

Other indicators of acceptance of responsibility are notably absent. Volpe has not suggested that he pay restitution, and he did not voluntarily resign from the police department or help authorities recover evidence. Indeed, he asked a fellow officer, Sergeant Wernick, how best to dispose of the broom handle and then threw it into a dumpster.

In short, neither a belated guilty plea nor a belated attempt to exculpate one of his co-defendants and inculpate another warrant an adjustment for acceptance of responsibility.

### C

■ Volpe objects to the four-level adjustment under § 2A2.2(b)(2)(B) for use of a "dangerous weapon" during the squad-car assault of Louima and the assault of Antoine. The government does not dispute the legal basis for Volpe's objection. But, as the Court has already noted, these assault counts have been grouped with the sexual abuse count and do not increase the offense level for that count in any way. *See* Appendix. Without reaching the merits of Volpe's objection, the Court holds it is irrelevant to the final Guidelines level.

### D

■ Volpe raises several related objections to the adjustments adopted by the Probation Department because Louima (i) was in handcuffs and (ii) in police custody during the sexual assault, and because Volpe (iii) acted as a public official or under color of law, and (iv) committed the assault through use of force.

As to the use of handcuffs, Volpe notes that Louima had been lawfully handcuffed by someone other than himself at the time of the assaults, and had not been restrained in order to facilitate the assaults. He says these factors remove the matter from the "heartland" of § 3A1.3.

Section 3A1.3 requires a two-point upward adjustment if the victim was restrained in the course of the offense. Because this is a "victim-related adjustment," it is largely irrelevant who restrained Louima and for what purpose. What matters is that Volpe repeatedly assaulted a shackled and vulnerable man. *See United States v. Clayton,* 172 F.3d 347, 353 (5th Cir.1999) (vulnerability of handcuffed victim is not mitigated by lawfulness of restraint).

■ Alternatively, Volpe argues that the adjustments for victim restraint under § 3A1.3 and for actions taken as a public official or under color of law under § 2H1.1(b)(1)(B) punish "the same offense conduct ... and harm." He also says that these two guidelines overlap with the adjustments under § 2A3.1(b)(3) because Louima was in police custody, and the four–level adjustment under § 2A3.1(b)(1) because Volpe committed sexual abuse through force. In essence, he says that the Probation Department is double– and treble–counting factors that flow from Volpe's status as a police officer.

Each of the guidelines at issue addresses an entirely distinct aggravating factor: the color-of-law adjustment punishes Volpe's acting improperly as a police officer; the in-custody adjustment punishes the abuse of his power over an individual in an officer's control, namely Louima; the restraint adjustment reflects Louima's helplessness; and the use-of-force adjustment reflects the violence and depravity of

Volpe's sexual abuse. *Cf. United States v. Rosario*, 7 F.3d 319, 321 (2d Cir.1993) (§ 3A1.3 adjustment does not constitute double counting "as long as restraint is not an element of the primary offense for which the defendant is being sentenced"); *United States v. Hershkowitz*, 968 F.2d 1503, 1505 (2d Cir.1992) ("that a defendant is acting under color of law does not necessarily contemplate a victim who is in custody and under defendant's control"); *Clayton*, 172 F.3d at 353 (lawful restraint of victim by police is "aggravating factor that intensifies the wilfulness, the inexcusableness and reprehensibleness of the crime"); U.S.S.G. § 2A3.1, comment. (guideline includes separate enhancements for abuse through force and abuse of prisoner).

Police officers who assault civilians under color of law do not necessarily handcuff their victims, nor do they need to be in police cars or precinct houses to do so. Still less does every civil rights violation under color of law involve aggravated sexual assault through the forcible use of a broken broomstick. Volpe did all of these things, and at every step he increased his culpability and Louima's suffering.

### E

█ Volpe asserts two objections to the use of the sexual abuse guideline, § 2A3.1, in calculating his base offense level. First, he says his conduct falls outside the "heartland" of this guideline because "there was no sexual component of any kind or whatsoever in this incident" and no indication that Volpe "took sexual pleasure and/or was sexually gratified by his behavior toward Mr. Louima."

Section 2A3.1 sets forth the base offense level for aggravated sexual abuse as defined by 18 U.S.C. § 2241. *See* U.S.S.G. § 2A3.1, comment. A defendant is guilty of aggravated sexual abuse under 18 U.S.C. § 2241(a) when he causes another person to engage in a "sexual act" by using force against that person. The statute defines "sexual act" to include any "penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object with the intent to abuse, humiliate, harass, degrade or arouse or gratify the sexual desire of another person." 18 U.S.C. § 2246(2)(C).

The applicability of this guideline to Volpe's crime could hardly be clearer. Volpe does not dispute that he "penetrate[d] ... the anal ... opening of another person by ... an[ ] object." 18 U.S.C. § 2246. Nor can it be doubted that he did so "with the intent to abuse, humiliate, harass, [or] degrade" Louima. *Id.* In fact, he admitted during his plea allocution that he sodomized Louima in order to "humiliate" and "intimidate" him. Volpe's suggestion that his lack of "sexual gratification" removes his conduct from the heartland of § 2A3.1 both ignores the text of the relevant statute and distorts the nature of sexual assault. *See United States v. Powers*, 59 F.3d 1460, 1465 and n. 5 (4th Cir.1995) (stating that "[a] majority of commentators now recognize the principle that rape is a violent act" rather than a purely sexual act, and collecting authorities); U.S.S.G. § 2A3.1, comment. ("[s]exual offenses addressed in this section are crimes of violence").

█ Volpe's second objection under this guideline is that the application of § 2A3.1(b)(1) amounts to "double counting." Section 2A3.1(b)(1) requires a four-level adjustment if the sexual abuse "was committed by the means set forth in 18 U.S.C. § 2241,"—that is, by force. Volpe admits to "pushing, kicking and punching" Louima in the bathroom, but he says that conduct occurred "prior to the use of the stick" and is more appropriately categorized as aggravated assault under § 2A2.2. What remains, according to this reasoning, is "the use of the stick," which Volpe says cannot be counted both as the means of committing a sexual act and as the exercise of force that triggered the § 2A3.1(b)(1) adjustment.

There is no double counting regarding the use of force. By "pushing, kicking and

punching" Louima in the bathroom immediately before the sexual assault, Volpe committed sexual abuse through the use of force. Even if, as Volpe urges, those actions occurred before the sexual abuse and should thus be treated under a separate guideline, Volpe's "use of the stick"—that is, his sodomizing Louima with enough force to puncture his rectum and bladder—was certainly forceful enough to trigger § 2A3.1(b)(1) on its own.

Volpe's primary complaint apparently is not that he did not use force, but that application of § 2A3.1 generally and the use-of-force adjustment in particular results in "untoward consequences"—namely a much longer sentence. The Sentencing Commission presumably understood these consequences when it established the pertinent offense levels.

## F

The Pre–Sentence Report alleges that Volpe engaged in criminal police misconduct on three prior instances, none of which resulted in criminal charges. Volpe objects to any reliance on such conduct in enhancing his Guidelines range or declining to depart downward.

Neither the Court nor the Probation Department base any adjustments or refusals to depart upon the conduct at issue. Volpe's objection is therefore irrelevant to his sentence.

## IV

■ Volpe moves for downward departures on the grounds that (i) he is unusually susceptible to abuse in prison; (ii) he has "facilitat[ed] the administration of justice" since his guilty plea; (iii) his assault of Louima falls outside the "heartland" of the sexual assault guideline; (iv) the combination of base level offenses and adjustments "overstates the harm" he caused; (v) the offense conduct was "aberrant behavior"; and (vi) the victim's conduct contributed to provoking his behavior.

### A

Section 5K2.0 of the Sentencing Guidelines allows the Court to depart where it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines."

In *Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court upheld the district court's downward departure under § 5K2.0 in the sentencing of two of the Los Angeles Police Department officers convicted in the beating of Rodney King. The district court granted a three-level departure in part because it found that

> the extraordinary notoriety and national media coverage of this case, coupled with the defendants' status as police officers, make [the officers] unusually susceptible to abuse in prison.

*Id.,* 518 U.S. at 112, 116 S.Ct. at 2053. In upholding the departure, the Supreme Court stressed that it was both the brutality of the crimes and the resulting publicity that removed the case from the "heartland" of the applicable guidelines. The officers' crimes "were by definition the same for purposes of sentencing as those of any other police officers convicted under [the applicable statute], sentenced under [the applicable guideline], and receiving the upward adjustments petitioners received." *Id.* Yet the "widespread publicity and emotional outrage" surrounding the case rendered the defendants especially susceptible to abuse. *Id.* (internal quotations omitted).

### 1

Volpe argues that his status as a police officer and the notoriety of his case warrant a downward departure both because these factors expose him to abuse and because to avoid abuse the Bureau of Prisons may place him in segregation.

The Government concedes that the Court has discretion under *Koon* to depart

downward on this ground. But they argue that the reasons offered for such a departure—that Volpe acted as a police officer and that his crime was appalling enough to draw extensive media coverage—are precisely the reasons his sentence is so high to begin with. A downward departure, according to the Government, "would contravene fundamental notions of justice—that the more egregious the crime, the harsher the punishment deserved." *Cf. Koon,* 518 U.S. at 116, 116 S.Ct. at 2055 (Souter, J., concurring in part and dissenting in part) ("[t]o allow a departure on this basis is to reason, in effect, that ... the more egregious the act, the less culpable the offender.").

This argument has force. Short of intentional murder, one cannot imagine a more barbarous misuse of power than Volpe's. His sentence amply reflects what the Government calls "the unique depravity of his crime." Volpe's offense level has been increased by seventeen points because of the violence of his crimes and his position as a police officer: four levels because he sexually abused Louima through the use of force; three levels because of the extent of Louima's injuries; six levels because Volpe was a police officer acting under color of law; two levels because Louima was under arrest and in custody; and two levels because Louima was in handcuffs during the assault. Each of these adjustments is fully warranted. The net effect, under the Probation Department's calculation, was to increase Volpe's potential prison term from a maximum of nine years to a minimum of life. *Cf. Koon,* 518 U.S. at 88–89, 116 S.Ct. at 2042 (in calculating total offense level, district court declined to add four-level upward adjustment for use of force, departed downward by eight levels on various grounds, and sentenced officers to two-and-one-half years in prison).

It is one thing to impose longer prison terms on those who violently abuse their official authority; it is another to subject them to abuse or unusually harsh conditions while in prison. The Sentencing Commission operates under a "mandate of proportionality," meaning that the Commission must "impose[ ] appropriately different sentences for criminal conduct of differing severity." U.S.S.G. Ch. I, Pt. A.3 (policy statement). The Sentencing Guidelines embody this mandate by assigning offense levels to various aspects of criminal conduct; the higher the total offense level, the longer the prison term. The Guidelines thus calibrate punishment by varying the length of a prison term, not its severity. The Court should seek proportionality in the same manner, no matter how strongly it condemns a defendant's behavior.

Of course in some cases the Guidelines do authorize punishment that is harsher, not merely more prolonged. For example, within certain ranges a defendant may be sentenced to probation, home detention, or supervised release in lieu of prison. *See* U.S.S.G. Ch. 5, Pts. B, C, D and F. Federal law also imposes the death penalty for certain crimes. *See, e.g.,* 18 U.S.C. § 1111 (first degree murder); 18 U.S.C. § 37 (violence at airports resulting in death); 18 U.S.C. § 229A (use of chemical weapons resulting in death). But these variations are inapplicable to the Guidelines range at issue, within which punishment varies only by the number of months. *See* U.S.S.G. Ch. 5, Pt. C. The notion that those months should be more severe because of the nature of the crime is entirely foreign to the federal Sentencing Guidelines scheme.

In addition, as in *Koon,* what removes this case from the heartland of the applicable guideline is not merely the violence of Volpe's crime or his status as a police officer, but those factors combined with the extensive national publicity surrounding this case. And as in *Koon,* such publicity will expose Volpe to abuse at the hands of other prisoners or segregation to avoid such abuse. *Cf. United States v. Colbert,* 172 F.3d 594, 597–98 (8th Cir.1999) (denying downward departure under § 5K2.1 for police officer where crime did not re-

ceive "torrent of publicity" comparable to that in *Koon* ). Volpe is to be punished for his crimes, not for the attendant media coverage.

### 2

The Government also disputes the factual basis for this departure. A district court must support a departure under § 5K2.0 by findings of fact, *see United States v. Tropiano,* 50 F.3d 157, 164 (2d Cir.1995), and the defendant bears the burden of proving by a preponderance of the evidence that the circumstances of his case warrant a downward departure. *See United States v. Anders,* 956 F.2d 907, 911 (9th Cir.1992).

The Government says Volpe has failed to show that he will be abused or his confinement will be unusually harsh or restrictive. The Government apparently does not dispute that Volpe will be vulnerable to abuse in prison. Instead, it argues that the Bureau of Prisons is equipped to protect Volpe from this risk. The Government submits a letter to that effect from Henry J. Sadowski, Regional Counsel to the Bureau of Prisons. The letter states that Volpe will likely be placed in the general population unless there is "specific and reliable information" that his security is endangered. In that event, Volpe could be transferred to another facility, placed in segregation, or placed in a Special Housing Unit "until such time as he could be placed back in the general population without endangering his security." Sadowski also notes that the Bureau of Prisons currently houses 661 former law enforcement officials and "has been very successful in providing secure conditions of confinement ... without subjecting them to disproportionately more restrictive conditions of confinement."

The facts before the Court support a two-level downward departure under § 5K2.0. The extraordinary notoriety of this case and the degree of general opprobrium toward Volpe are matters of public record. As in *Koon,* such publicity coupled with the defendant's status as a police

officer are sufficient to support a finding of "unusual[ ] susceptib[ility] to abuse." 518 U.S. at 112, 116 S.Ct. at 2053.

It is also evident that Volpe could serve a substantial portion of his sentence in some form of segregation. Indeed, Volpe has been segregated since May 25, 1999 while awaiting sentencing. According to the Bureau of Prisons, any segregation would last "only until such time as [Volpe] could be placed back in general population without endangering his security." But it would be fatuous to believe that Volpe's crime will soon be forgotten, or that the attendant threat to his security will soon diminish.

### B

 Volpe seeks a downward departure on the basis of his efforts to "facilitate the administration of justice" by "exonerating an innocent man and ... inculpat[ing] another." He bases this motion on statements he made to the Government and to the Probation Department to the effect that his accomplice in the sexual assault on Louima was Wiese, not Schwarz. Volpe's attorney, Marvin Kornberg, attempted to negotiate a plea bargain with the Government on the basis of these statements three days before Volpe pleaded guilty. The Government rejected this offer. Volpe repeated his contentions in his written statement to the Probation Department.

The Second Circuit has allowed a downward departure for "activities facilitating the proper administration of justice in the District Courts." *See United States v. Garcia,* 926 F.2d 125, 127 (2d Cir.1991). In *Garcia,* the defendant's early and consistent cooperation with the Government "broke the log jam in a multi-defendant case" by helping to induce his co-defendants to plead guilty. *Id.* at 128. The court approved departures both under § 5K1.1 for substantial assistance to the Government, and under § 5K2.0 for assis-

tance to "the judicial system." *Id.* at 127–28.

This ground for departure is not accepted. Volpe did not testify and the trial proceeded to a verdict entirely without Volpe's "assistance." He thus did not break any "log-jam" in the case against his co-defendants or otherwise "facilitate the administration of justice in the District Court[ ]." *See Garcia,* 926 F.2d at 127 ("facilitation of justice" departure available for help to the courts, not for help to the prosecution); *cf. United States v. Armstrong,* 842 F.Supp. 92, 96 (S.D.N.Y.1994) (denying departure where defendant's purported assistance was not trustworthy and did not precipitate the guilty pleas of co-defendants).

### C

■ Volpe also moves for departure on three related grounds regarding the overall offense level imposed by the Guidelines. The first of these essentially restates Volpe's objections to the application of the sexual abuse guideline. But rather than focusing on the details of the Guidelines, Volpe here asks the Court to consider the aggregate effect of the various adjustments to which he objects. He notes that the Presentence Report's adjusted offense level of forty-six for the sexual assault count would mandate a sentence of life without parole, the same sentence he would receive for second-degree murder.

Volpe similarly urges the Court to consider the cumulative impact of the adjustments loosely revolving around Volpe's status as a police officer—those for acting as a public official under color of law, for assaulting Louima while he was handcuffed and in custody, and for the use of force. As a whole, these factors raise Volpe's offense level under the Probation Department's calculation by fourteen points, thus increasing his potential imprisonment from a maximum of roughly thirteen years to life. Volpe says that these adjustments, whatever their individual merits, collectively "overstate the harm."

Finally, Volpe says the "unique combination of facts and circumstances in this case" merit a downward departure.

Just as Volpe's objections to certain of the Guidelines at issue are not acceptable, so are his claims that the total offense level seems to him to be excessive. Even if the Court were so inclined, it could not accept this argument. Departures are warranted "only when [the court] finds an 'aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.' " U.S.S.G. Ch. 1, Pt. A(4)(b), *quoting* 18 U.S.C. § 3553(b). The Court may not depart solely because the overall Guidelines range appears too high or the sentence too severe. *See United States v. Chabot,* 70 F.3d 259, 260 (2d Cir.1995).

In any event, the Court has rejected Volpe's arguments on their merits under the Guidelines. Volpe's Guidelines range is high, but the Sentencing Commission promulgated those Guidelines, and Volpe's crimes were unusually heinous. It would be difficult indeed to "overstate the harm" Volpe inflicted upon Louima and upon society at large. Much of that harm stems from precisely the constellation of factors that Volpe says unduly increased his offense level—namely, extreme sexual violence inflicted by a police officer, acting under color of law, upon a handcuffed prisoner. No downward departure is warranted on the ground that these factors distort the spirit of the Guidelines. If anything, the Guidelines refer to these factors as warranting an *upward* departure. U.S.S.G. § 5K2.8 (authorizing departure for conduct that is "unusually heinous, cruel, brutal, or degrading to the victim").

### D

Volpe next moves for a departure on the basis of aberrant behavior. In a footnote, he adds a related motion for departure on grounds of "mental and emotional condi-

tion" or "diminished capacity." Neither motion is acceptable.

 In deciding whether a defendant's criminal acts are aberrant, the Court considers the totality of circumstances surrounding the acts. *Zecevic v. United States Parole Commission,* 163 F.3d 731 (2d Cir.1998). Under this standard, aberrant behavior is in essence "a short-lived departure from an otherwise law-abiding life." *Id.* at 735 (internal quotations omitted). But "aberrant behavior and first offense are not synonymous." *Id.* (internal quotations omitted). Rather, the Court considers a range of factors, including

(1) the singular nature of the criminal act; (2) the defendant's criminal record; (3) the degree of spontaneity and planning inherent in the conduct; (4) extreme pressures acting on the defendant, including any psychological disorders from which he may have been suffering, at the time of the offense; (5) the defendant's motivations for committing the crime, including any pecuniary gain he derived therefrom; and (6) his efforts to mitigate the effects of the crime.

*Id.* at 736. This list is not exclusive, and no single factor is dispositive. *Id.*

### (i) Singular Act

 The most sensational of Volpe's crimes, the sexual assault of Louima, was undoubtedly "singular" insofar as Volpe had never before behaved in that manner. But it was not Volpe's only criminal act. He also committed aggravated assault against both Antoine and Louima, as well as false prosecution as to Antoine and witness tampering as to Louima. These acts were admittedly related in time and origin. But they were not "so closely related that . . . they constitute a single act," *United States v. Takai,* 941 F.2d 738, 743 (9th Cir.1991) (holding that conspiracy to bribe INS agent and actual offer of cash constituted "single act" for purposes of determining aberrant conduct). Nor were

they "multiple acts leading up to the commission of a single crime." *United States v. Grandmaison,* 77 F.3d 555, 563 (1st Cir.1996). Volpe's conduct thus cannot be considered a single aberrant act.

### (ii) Criminal History

The Government has offered to introduce evidence of prior instances of police abuse. Such evidence is unnecessary, for even if Volpe's past is free of criminal conduct, the remaining *Zecevic* factors disqualify Volpe from receiving a departure on this ground. *See United States v. Rosier,* No. 98–1425, 1999 WL 197217, at *1 (2d Cir.1999) (absence of criminal history does not support finding of aberrant behavior) (*citing Zecevic,* 163 F.3d at 735).

### (iii) Spontaneity and Planning

Volpe's violent acts were neither spontaneous nor unplanned. Over the course of at least 35 minutes, Volpe committed a series of violent acts that escalated in intensity from beating Antoine with a flashlight to beating Louima with a radio to sexually assaulting Louima with a broomstick. Louima was in handcuffs and posed no conceivable threat to Volpe during any of these attacks. In committing the last and most abhorrent of these acts, Volpe acted methodically and deliberately: he arrived at the precinct, saw Louima, found a broomstick, broke it in half and stashed one section in the bathroom, borrowed a pair of gloves, returned to the bathroom, taunted, beat and kicked Louima, told him not to yell, rammed the stick into Louima's rectum, waved the feces-covered stick in Louima's face, then left the bathroom and returned the gloves. On his way out of the bathroom, he threatened to kill Louima if he revealed what had happened. Later, as Louima sat outside his holding cell waiting to be taken to the hospital, Volpe pulled a chair from him and forced him to get back in the cell and down on his knees. Still later, he twice boasted to fellow officers that he "broke a man down" and "took a man down," and then

proudly showed off the feces-stained broom handle.

### (iv) Extreme Pressures and Diminished Capacity

Volpe attributes his conduct in part to the confusion and fear resulting from the events at the nightclub, where he was yelled at and punched to the ground. Volpe was also reportedly feeling the stress of being a police officer in an inner city precinct. But however frightened and angry he was, Volpe's response was wildly out of proportion to the pressures upon him.

Volpe also says his overall psychological and emotional condition added to these immediate pressures. At defense counsel's request, Dr. N.G. Berrill, a psychologist, interviewed Volpe and provided a psychological profile to the Probation Department. Dr. Berrill found that Volpe was "vulnerable to becoming overly influenced by [intense] emotions" and to poor decision making "at times of significant external stress." He concluded that the "principal catalyst" for Volpe's criminal behavior was Volpe's "fear, anxiety, physical pain and momentary disorientation [and] sense of powerlessness out on the street." But Dr. Berrill also concluded that Volpe was a "basically normal, 25–year old police officer" of average intelligence from a stable and supportive family. *Cf. United States v. DeRoover*, 36 F.Supp.2d 531 (E.D.N.Y.1999) (single mother's extensive history of sexual abuse and family suicide and need to provide for five children weigh in favor of aberrant behavior departure); *United States v. Fairless*, 975 F.2d 664, 668 (9th Cir.1992) (defendant's manic depression supported finding of aberrant behavior).

The Court has carefully considered Dr. Berrill's report as well as the exhaustive evidence adduced at trial, but finds no basis to conclude that Volpe acted under the sort of "extreme pressure" that warrants a departure for aberrant behavior.

In a footnote, Volpe claims his psychological condition also justifies a departure under § 5H1.3, "Mental and Emotional Condition," or § 5K2.13, "Diminished Capacity." But § 5H1.3 states that mental and emotional conditions are *not* ordinarily grounds for a departure, "except as provided in Chapter 5, Part K, subpart 2 of the Guidelines." Section 5K2.13 allows a departure where the defendant suffered from "a significantly reduced mental capacity," defined in Application Note 1 as "a significantly impaired ability" to understand the wrongfulness of one's acts or control wrongful behavior. U.S.S.G. § 5K1.13 at comment. (n. 1). A Court may not depart under § 5K2.13 where "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence." U.S.S.G. § 5K2.13(2). Even if Volpe was suffering from a reduced mental capacity, which he was not, his offense disqualifies him from receiving this departure.

### (vi) Motivation.

Volpe makes no claim that his motivation should weigh on the side of leniency. Indeed, his admitted intention to "humiliate" and "intimidate" his victim significantly undermines his claim of aberrant conduct.

### (vii) Mitigation.

Volpe's claims regarding mitigation—that he has apologized to Louima and has tried to see that his "real" accomplice is brought to justice—merit little discussion. Far from cushioning the impact of his offense, Volpe made things worse by threatening to kill Louima and boasting to fellow officers about his acts. He hid material evidence and made absolutely no effort to assist the prosecution or the Court until well into the trial. Even then, as discussed, his efforts at cooperation were of no use to the Government or the Court. *Cf. United States v. Delvalle*, 967 F.Supp. 781, 784 (E.D.N.Y.1997) (defendant's extraordinary assistance to the gov-

ernment and the judicial system, despite the absence of § 5K1.1 letter, supported finding that offense conduct was aberrant).

Twenty months after the sexual assault, Volpe made statements through his attorney and to the press intimating that Louima's injuries were attributable to a homosexual encounter. His expressions of remorse to the Probation Department in preparation for sentencing do little to mitigate the effects of his earlier behavior. *Cf. United States v. Rosier*, No. 98–1425, 1999 WL 197217, at *2 (2d Cir.1999) (failure to mitigate partially outweighs lack of criminal history); *United States v. Russell*, 870 F.2d 18 (1st Cir.1989) (departure warranted where armored truck driver kept bag containing $80,000 in cash that was handed to him by mistake, but returned cash within a week and cooperated with the criminal investigation).

In sum, the totality of circumstances do not indicate that Volpe's offense conduct was sufficiently aberrant to warrant a departure.

### E

Volpe moves for a departure on the basis of the "victim's" conduct. He says that Louima's verbal confrontation with Volpe outside the nightclub contributed to his actions. He also seeks to impute to Louima the punch thrown by Jay Nicholas, since Volpe mistakenly believed it was Louima who hit him.

█ A Court may depart downward if a victim's conduct "contributed significantly to provoking the offense behavior." U.S.S.G. § 5K2.10. In applying this guideline, the Court considers, among other things, the comparative size and strength of the victim and defendant; the persistence of the victim's conduct; and the danger reasonably perceived by and actually presented to the defendant. *See id.* § 5K2.10(a) –(e).

█ To rephrase Volpe's argument is to refute it. Volpe essentially contends that Louima's brief verbal affront, together with Volpe's mistaken belief that Louima had punched him, "provoked" a series of physical assaults at different sites over the course of at least thirty-five minutes culminating in a violent sexual assault on a handcuffed, bloodied man that left his victim hospitalized for two months.

In any event, "[v]ictim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of the [criminal sexual abuse]." U.S.S.G. § 5K2.10. Volpe says the "language limiting" this aspect of the guideline leaves room to depart. The only such limitation is that the guideline does not *"ordinarily"* allow departure from a sentence for criminal sexual abuse. *Id.* (emphasis added). Volpe's sexual assault is extraordinary only for its violence and its commission by a uniformed police officer against a handcuffed prisoner. No departure is warranted.

### V

Except as noted above in this memorandum and order, the Court adopts the Probation Department's findings as set forth in the Presentence Report and the addendum thereto.

So ordered.

## APPENDIX

### I. IMPRISONMENT

#### A. Offense Levels

*Count IA and Count III: Conspiracy to Deprive and Deprivation of Civil Rights by Aggravated Assault of Abner Louima*

Base offense level
Deprivation of civil rights by aggravated assault
(§§ 2H1.1(a)(1), 2A2.2(a)) 15
Bodily injury to victim
(§ 2A2.2(b)(3)) 2

17

Acts committed by public official or
under color of law (§ 2H1.1(b)(1)(B)) 6
Physical restraint of victim (§ 3A1.3) 2

Subtotal 8

Adjusted offense level: 25

*Count IB and Count IV: Conspiracy
to Deprive and Deprivation of Civil
Rights by Aggravated Sexual Abuse
of Abner Louima*

Base offense level:
 Deprivation of civil rights by
 criminal sexual abuse
 (§§ 2H1.1(a)(1), 2A3.1(a)) 27
 Use of force (§ 2A3.1(b)(1)) 4
 Victim in custody (§ 2A3.1(b)(3)) 2
 Severity of injury
 (§ 2A3.1(b)(4)(c)) 3

*Subtotal* 36

Acts committed by public official or
under color of law (§ 2H1.1(b)(1)(B)) 6
Physical restraint of victim (§ 3A1.3) 2

*Subtotal* 8

**Adjusted offense level:** 44

*Count VII: Deprivation of Civil Rights by
Aggravated Assault of Patrick Antoine*

Base Offense Level:
 Deprivation of civil rights by ag-
 gravated assault
 (§§ 2H1.1(a)(1), 2A2.2(a)) 15
 Bodily injury to victim
 (§ 2A2.2(b)(3)) 2

*Subtotal* 17

Acts committed by public official or
under color of law (§ 2H1.1(b)(1)(B)) 6
*Subtotal* 6

The sentencing range for an offense lev-
el of 42 is 360 months to life. The Court
imposes a sentence of 360 months.

## II. SUPERVISED RELEASE.

The Court imposes a term of supervised
release of five years, and as a special

**Adjusted Offense Level** 23

*Count VIII: Deprivation of Civil
Rights by False Arrest of Patrick
Antoine*

Base Offense Level:
 Deprivation of civil rights by ob-
 struction of justice as to aggra-
 vated assault (§§ 2H1(a)(1),
 2J1.2, 2X3.1(a)) 21

**Adjusted Offense Level** 21

*Count IX: Witness Tampering*

Base Offense Level:
 Deprivation of civil rights by ob-
 struction of justice as to aggra-
 vated sexual abuse
 (§§ 2H1(a)(1), 2J1.2, 2X3.1(a)) 30

Physical restraint of victim (§ 3A1.3) 2

**Adjusted Offense Level** 32

## B. MULTIPLE COUNT ANALYSIS

| Counts | Offense Level | Units |
|---|---|---|
| IA, IB, III, IV, IX (§ 3D1.2(b)) | 42 | 1 |
| VII, VIII (§ 3D1.2(b)) | 32 | 0 |
| Increase in offense level | None | |
| **Combined Offense Level** | 44 | |

## C. DEPARTURES

Susceptibility to Abuse in Prison
(§ 52K.0) – 2

**D. ADJUSTED TOTAL OF-
 FENSE LEVEL** 42

**E. SENTENCE**

condition a prohibition on possession of a
firearm.

## III. FINES AND SPECIAL ASSESS-
 MENT

The Court is required to impose a spe-
cial assessment of $525.00: $100 each for

Counts I, III, IV, VII and IX, and $25 for Count VIII. The Court does not impose a fine, finding that Volpe will be unable to pay a fine.

## IV. RESTITUTION.

The Court imposes restitution to Louima in the amount of $277,495.09 to be paid at the rate of $25.00 per month.

The Court also imposes restitution to Antoine in the amount of $3,550.27 to be paid at the rate of $25.00 per month.