Diane GORDON, Plaintiff,

v.

Edward GRIFFITH, individually and in his capacity as New York State Assemblyman to the 40th Assembly District, Defendant.

No. CV 99–5106.

United States District Court, E.D. New York.

March 16, 2000.

Joseph A. Grob, Moskowitz & Book, LLP, New York City, for Plaintiff.

Attorney General Eliot Spitzer by Judith T. Kramer, Assistant Attorney General, New York State Department of Law, New York City, for Defendant.

*MEMORANDUM AND ORDER*

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I INTRODUCTION ................................................39

II FACTS......................................................40
   A. Parties ................................................40
   B. Political Environment ..................................40
   C. Protest and Press Conference .........................41
   D. Termination...........................................41

III LAW.......................................................41
   A. Free Speech ..........................................41
   B. Republican Government ...............................42
      1. Deference to State Legislature .....................44
         a. New York State Assembly ....................45
         b. Political Considerations in Legislators' Staffing Decisions .............45
      2. Representation.....................................46
         a. Early Theory ...............................46
         b. Modern Practice............................47
            i. Political Instruction.......................48
            ii. Political Accountability....................48
         c. Staff Speech and Constituent Relations ................49
            i. Staff Speech ..............................50
            ii. Legislators' Counterspeech .................50
            iii. Termination ...............................51
   C. Related First Amendment Doctrines .....................52
      1. *Pickering* .......................................52
      2. *Elrod*...........................................54
      3. Legislators' Concerns .............................55
         a. *Pickering*'s Balancing.......................55
         b. *Elrod*'s Job Classification ..................56
   D. First Amendment and Staff Speech ....................57

IV APPLICATION OF LAW TO FACTS........................58
   A. Federal Claims .......................................58
   B. State Claims .........................................58

V CONCLUSION ..............................................59

## I. INTRODUCTION

Plaintiff is a legislative aide who spoke out publicly on a controversial matter. Defendant, her boss and a state legislator, believed her comments were inappropriate. He fired her. The parties disagree on whether her right to free speech was violated.

Surprisingly, this appears to be an issue of first impression. In approaching this matter humility of federal judges is mandated by consideration of the needs of our state republican governments and by separation of powers. Judges with lifetime tenure must exercise restraint in overseeing the staffing decisions of legislators who periodically stand for office. This modesty is required even though, as James Madison recognized, our

independent tribunals will consider themselves ... the guardians of those rights [in the Bill of Rights]; ... an impenetrable bulwark against every assumption of power in the legislature ...; they will be naturally led to resist every encroachment of rights expressly stipulated for in the Constitution by the declaration of rights.

Debates in Congress over Madison's Amendments, 8 June 1789, *in* John Kaminski & Richard Leffler, *The Creation of the Bill of Rights* 124–25 (1999).

Plaintiff brought this action pursuant to section 1983 of Title 42 alleging violations of her constitutional rights of speech and association. *See* 42 U.S.C. § 1983; *see also* U.S. Const. amend. 1. She has also alleged violations of the New York state

constitution and state labor law. *See* N.Y. Const. art 1, § 9; N.Y. Labor Law § 201–d(2).

Defendant has moved for dismissal. *See* Fed.R.Civ.P. 12(b)(6). The motion is granted. Plaintiff has failed to state a claim under the Federal Constitution. As for the pendent state claims, prudential considerations require dismissal.

## II. FACTS

The factual allegations in the complaint are assumed to be true. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

### A. Parties

Defendant Griffith is the New York State Assemblyman for the Fortieth Assembly District, which is located in Brooklyn, New York. He runs for office every two years. *See* N.Y. Const. art. 3, § 3.

In January 1997, Griffith hired plaintiff, Diane Gordon, as his Community Relations Director. *See* Compl. ¶ 7. Gordon worked in Assemblyman Griffith's Brooklyn district office as a salaried employee of the State of New York. *See* Compl. ¶ 11. Her responsibilities included:

- "Meeting with community leaders such as the presidents of tenant associations and block associations on behalf of Assemblyman Griffith" (Compl.¶ 10);
- "Meeting with parents' groups, senior citizens, and other constituents on behalf of Assemblyman Griffith" (Compl.¶ 10); and
- "Attending community meetings and events on behalf of Assemblyman Griffith" (Compl.¶ 10).

While engaging in these activities, Gordon introduced herself as a representative of Assemblyman Griffith. *See* Compl. ¶¶ 12, 14.

In addition to these official duties, Gordon was required to "engag[e] in partisan political activity" on Assemblyman Griffith's behalf. Compl. ¶ 17. She "assisted political candidates friendly to Assemblyman Griffith during election time," using her personal time, vacation time and sick leave to do so. Compl. ¶ 17. Apart from her responsibilities to defendant, Gordon was in her own right a delegate to the New York State Democratic Party for the Fortieth Assembly District. *See* Compl. ¶¶ 6, 14. Both the plaintiff and the defendant run on the Democratic ticket.

### B. Political Environment

Judicial notice of the political environment is taken. *See, e.g., Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir. 1991) ("[A] court considering a motion to dismiss] may also consider matters of which judicial notice may be taken under Fed.R.Evid. 201."); Fed.R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . generally known within the territorial jurisdiction of the trial court"); *id.* 201(f) ("Judicial notice may be taken at any stage of the proceeding."); *see generally* Margaret A. Berger et al., *Federal Evidence,* § 201, at 201–07 to 97 (Joseph M. McLaughlin ed., 1997); John W. Strong et al., *McCormick on Evidence* § 329, at 493 (5th ed.1999).

The backdrop of this case was the politically charged environment in New York City during the Spring of 1999. The City's police force was under intense scrutiny because of several incidents allegedly attributable to racially motivated "police brutality." In 1997 a Haitian immigrant, Abner Louima, was viciously beaten and sodomized by police officers while in custody. *See United States v. Volpe,* 78 F.Supp.2d 76, 79–81 (E.D.N.Y.1999). Criminal charges were pending against the officers involved in the Louima matter and jury selection was underway. A second incident occurred on February 4, 1999; a 22–year old West–African immigrant, Amadou Dialo, died after suffering multiple bullet wounds in a police shooting. *See People v. Boss,* 261 A.D.2d 1, 701 N.Y.S.2d 342, 343–47 (1st Dep't 1999).

As plaintiff puts it, these two incidents were "at the very forefront" of public at-

tention. Pl.'s Res. Mem. at 14. On an almost daily basis, articles and editorials appeared in the leading Metropolitan newspapers. *See, e.g.,* Joseph P. Fried, *Graphic Details as Trial Opens in Louima Case,* N.Y. Times, May 5, 1999, at A1; Helen Peterson, *Jury Chosen; Opening Arguments Expected Tuesday in Police Brutality Case,* N.Y. Daily News, May 4, 1999, in dom. sec.; Jodi Wilgoren, *Under One Roof, Prayers for Diallo and a Hug for Guiliani,* N.Y. Times, April 21, 1999, at B1; Tom Topousis & Roosevelt Joseph, *Black Cop Group Calls for End to Hate Posters,* N.Y. Post, April 19, 1999, at 18. A series of protests and marches were held at City ·Hall and various police stations. And the United States Department of Justice was in the midst of an investigation into possible patterns of police misconduct.

### C. Protest and Press Conference

On May 5, 1999, plaintiff Gordon took part in a protest and press conference against "police brutality." Compl. ¶ 20. The demonstration occurred outside of the 75th Police Precinct Stationhouse. This Precinct is within Assemblyman Griffith's legislative district. *See* Compl. ¶ 20. Because this gathering occurred during a weekday, Gordon took a "personal day off from her job." Compl. ¶¶ 19–21.

According to plaintiff Gordon, the events were "organized in response to an incident wherein several officers associated with the 75th Police Precinct were alleged to have beaten a perpetrator even though he had been subdued and was already in handcuffs." Pl.'s Resp. Mem. at 14. Gordon spoke, expressing her view of "police brutality" both during the protest and at a related press conference. *See* Compl. ¶ 20; Pl.'s Resp. Mem. at 14. She did not assert that her opinions "represented the comments, beliefs or opinions of Assemblyman Edward Griffith." Compl. ¶ 24.

### D. Termination

Upon reporting for work the next day, May 6, 1999, Gordon was summoned to Assemblyman Griffith's office. *See* Compl.

¶ 26. In the course of a heated exchange, Griffith allegedly stated:

> Who do you think you are. I don't care if you are a district leader. You went against the 75th Precinct and the officers there. They are my friends. You are insubordinate.

Compl. ¶ 27.

Assemblyman Griffith then phoned the Precinct, apologized for Gordon's participation in the May 5 protest, and informed a Police Department Inspector that Gordon would be terminated for her participation. *See* Compl. ¶ 28. Gordon was immediately fired. *See* Compl. ¶ 29; Pl.'s Resp. Mem. at 14–15.

## III   LAW

### A. Free Speech

Free speech has utilitarian foundations. It "assure[s the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (quoting *Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)). By allowing the open exchange of ideas and the voicing of criticisms of those in power, free speech protects the heart of the democratic process. *See, e.g., Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("[S]peech concering public affairs ... is the essence of self-government."); *see generally* Alexander Meiklejohn, *Free Speech and Its Relation to Self–Government* 15–16, 24–27, 39 (1948) ("[Freedom of speech] is a deduction from the basic American agreement that public issues shall be decided by universal suffrage."). Without free speech our system of government might slip into tyranny by, and over, the ignorant. *See* Cass Sunstein, *Free Speech Now,* 59 U.Chi. L.Rev. 255, 301, 304–06 (1992) ("Restrictions on political speech have the distinctive feature of impairing the ordinary channels for political [change].").

Considerations of personal fulfillment also support freedom to speak. *See, e.g., Curtis Publishing Co. v. Butts,* 388 U.S. 130, 149, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (plurality opinion) ("[Freedom of speech] is as much a guarantee to individuals of their personal right to make their thoughts public and put them before the community as it is a social necessity required of our political system and an open society." (internal quotation marks and citations omitted)). The right promotes the basic human interests in self-development and self-expression, particularly as those interests serve to further individual participation in our democratic government. *See, e.g.,* David A.J. Richards, *Free Speech and Obscenity Law: Toward a Moral Theory of the First Amendment,* 123 U.Pa. L.Rev. 45, 62 (1974) ("[T]he significance of free expression rests on the central human capacity to create and exercise symbolic systems, such as speech, writing, pictures, and [music].... In so doing, it nurtures and sustains the self-respect of the mature person."); *see generally* Martin Redish, *The Value of Free Speech,* 130 U.Pa. L.Rev. 591, 601, 604 (1982) ("[Political] democracy is merely a means to—or, in another sense, a logical outgrowth of—the much broader value of individual self-realization.").

Despite its importance, speech is not afforded absolute protection. *See, e.g., United States v. Frame,* 885 F.2d 1119, 1133 (3d Cir.1989) ("The rights of free speech and association are not absolute."). The strength of the barrier to interference varies with the asserted government interest in restricting particular speech. Greater consideration is "given to the government['s interest] when it acts as employer rather than as sovereign." *Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.1995) ("[W]e have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential." (quoting *Waters v.*

*Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion))).

Even as an employer, the government cannot, in the absence of an "appropriate reason[ ]," terminate public employees for their speech. *See Elrod v. Burns,* 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Individuals do not surrender all First Amendment protection by joining the ranks of government employment. *See United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); *Luck v. Mazzone,* 52 F.3d 475, 476 (2d Cir.1995) (per curiam); *Bowen v. Watkins,* 669 F.2d 979, 982 (5th Cir.1982).

Public employees are entitled to a substantial measure of asylum from dismissals and threats of dismissal for speaking, including those who would otherwise be terminable at will. Unfettered discretion to dismiss people employed by the government because of their speech would arm those in power with a "potent means" of suppressing information the public should have. *See Pickering v. Bd. of Educ.,* 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) ("[T]he threat of dismissal from public employment is ... a potent means of inhibiting speech.").

■ Only where government employees' interests in speaking are outweighed by a substantial and legitimate government interest can they be denied protection from discharge because of their speech. *See, e.g., Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 140 (2d Cir. 1999) ("[A] public employer cannot, with impunity, fire an employee who 'blew the whistle' on other employees' violations of the law on the ground that those disclosures impaired office morale[.]").

## B.  Republican Government

This case raises the delicate issue of whether a state legislator can, consistent with the constitutional guarantee of free speech, discharge a political aide for public

speech in the belief that what was said may interfere with his legislative interests and constituent relations. The answer turns in part upon relevant principles of republican governance as well as the First Amendment. *See* U.S. Const. art. IV, § 4 (Guarantee Clause); *see also* U.S. Const. amend. 10 (powers reserved to the states).

Enacted in the aftermath of the Civil War, the Fourteenth Amendment substantially limited the power of the states. *See Staub v. City of Baxley,* 355 U.S. 313, 321, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958) (First Amendment rights apply to state action through the Fourteenth Amendment's Due Process Clause). This curbing of authority was accomplished in part through the Due Process Clause of the Fourteenth Amendment which is deemed to incorporate many of the rights protected by the Bill of Rights, including the First Amendment guarantee of free speech. *See, e.g., Duncan v. Louisiana,* 391 U.S. 145, 148, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (enumerating incorporated rights); *see generally* Jerold H. Israel, *Selective Incorporation: Revisited,* 71 Geo. L.J. 253 (1982).

Rights incorporated through the Fourteenth Amendment may conflict with state policies that "go to the heart of representative government." *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). Article IV of the Federal Constitution "guarantee[s] to every State in this Union a Republican Form of Government." U.S. Const. art. IV, § 4. This provision recognizes "a State's constitutional responsibility for the establishment and operation of its own [representative] government." *Sugarman,* 413 U.S. at 648, 93 S.Ct. 2842; *see generally* Deborah Jones Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century,* 88 Colum. L.Rev. 1 (1988). It embodies two fundamental notions of self-government that are challenged by plaintiff's proposed extension of First Amendment tenure to legislators' staffs.

First, is the notion that the states and their citizens retain authority to prescribe the powers and operations of the principle organs of state government. *See, e.g., Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("[T]he authority of the people of the States to determine the qualifications of their most important government officials ... is an authority that lies at 'the heart of representative government.'"); *Printz v. United States,* 521 U.S. 898, 919, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) ("Although the States surrendered many of their powers to the new Federal Government, they retained 'a residuary and inviolable sovereignty.' This is reflected throughout the Constitution's text, [including] ... the Guarantee Clause, Art. IV, § 4, which 'presupposes the continued existence of the states and ... those means and instrumentalities which are the creation of their sovereign and reserved rights.'" (internal citations omitted)); *see also Highland Farms Dairy v. Agnew,* 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself."); *see generally Texas v. White,* 74 U.S. (7 Wall.) 700, 19 L.Ed. 227 (1868) ("[T]he preservation of the States, and the maintenance of their governments, are as much within the design and care of the Constitution as the preservation of the Union and the maintenance of the National government.").

Second, is a concern for relationships between the citizens and officials elected to the core democratic institutions of state government. *See, e.g., Printz,* 521 U.S. at 920, 117 S.Ct. 2365 ("The Constitution ... contemplates that a State's government will represent and remain accountable to its own citizens."); *United States v. Lopez,* 514 U.S. 549, 576, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) ("The theory that two governments accord more liberty than one requires for its realization two distinct and discernible lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States."); *New York v. Unit-*

*ed States,* 505 U.S. 144, 160, 168, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) ("Accountability is . . . diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate in matters not preempted by federal regulation."). A key relationship is that of state voters to their representatives in the legislature. *See, e.g, Foley v. Connelie,* 435 U.S. 291, 296, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) ("[The legislature] represents the choice, and right, of the people to be governed by their citizen peers."); *cf. Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."); *Bates v. Jones,* 131 F.3d 843, 851 (9th Cir.1997) (en banc) (O'Scannlain, J., concurring) ("It is axiomatic to say that the right to vote lies at the very core of our system of representative democracy.").

So significant is the preservation of this legislator-citizen relationship that six amendments to the Federal Constitution protect and enhance it. *See, e.g.,* U.S. Const. amend. I ("right to petition the Government for a redress of grievances"); U.S. Const. amend. XIV, § 1 (equal protection); U.S. Const. amend. XV, § 1 (prohibition of denial of franchise based on race); U.S. Const. amend. XIX, § 1 (prohibition of denial of franchise based on gender); U.S. Const. amend. XXIV, § 1 (prohibition of poll taxes); U.S. Const. amend. XXVI, § 1 (prohibition of denial of franchise to citizens eighteen years of age or older); *see also Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (racial gerrymandering); *Davis v. Bandemer,* 478 U.S. 109, 132, 135, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986) ("[U]nconstitutional discrimination occurs . . . when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole."); *see generally* Vicki C. Jackson, *Federalism and the Uses and Limits of Law: Printz and Prin-*

*ciple?,* 111 Harv. L.Rev. 2180, 2201 (1998) ("The fundamentality of the relationship between constituents and their elected representatives is emphasized by the attention that constitutional amendments have given to expanding the electorate." (footnote omitted)).

An extension of free speech tenure to legislative aides in the New York State Assembly would run headlong into the State's authority to prescribe the operation of its legislative body. It would also jeopardize the vital and dynamic relationship that must exist between elected legislators and their constituents.

### 1. Deference to State Legislature

No institution is more essential to a republican government than the legislature. Montesquieu, influenced by the British experience, argued as much in his political writings, and the Founding Fathers largely adopted this view, enshrining it in the Federal Constitution. *See generally* Oeuvres de Montesquieu, *The Spirit of the Laws* 154–55 (Thomas Nugent trans., 1949) (1748); *see also* Anne M. Cohler, *Montesquieu's Comparative Politics and the Spirit of American Constitutionalism* 153–58 (1988).

Among the governmental institutions in America, "[s]tate legislatures are, historically, the fountainhead of representative government in this country." *Reynolds,* 377 U.S. at 564, 84 S.Ct. 1362. As the Supreme Court has pointed out, "[w]ith the birth of our National Government, and the adoption and ratification of the Federal Constitution, state legislatures retained a *most important place* in our Nation's governmental structure." *Id.* at 564–65 (emphasis added); *see also id.* ("[They] have their roots in colonial times, and substantially antedate the creation of our Nation and our Federal Government.").

It would be surprising if James Madison when he authored the Bill of Rights would not have recognized that were unrestrained speech of political aides to interfere with effective representative gov-

ernment, some reconciliation would be required. Madison was a practical politician as well as a theoretician. *See, e.g.,* Ralph Ketcham, *James Madison: A Biography* 144–73 (1971). As a student of governments ancient and modern, and a member of the Continental Congress, Virginia's legislature, the Constitutional Convention, and the Congress of the United States (and ultimately as President of the United States), a workable, practically organized, representative legislature was central to his view of constitutional government.

### a. New York State Assembly

The New York Assembly is by design a " 'political' branch of [New York's] government." *People v. Ohrenstein,* 77 N.Y.2d 38, 47, 563 N.Y.S.2d 744, 565 N.E.2d 493 (1990); *see also* N.Y. Const. art. III; *see generally* Samuel C. Patterson, Ronald D. Hedlund, & G. Robert Boynton, *Representatives and Represented: Bases for Public Support for the American Legislatures* 21–55 (1975). With members of the Assembly compelled to stand for re-election every two years, a sharp line cannot be drawn between activities that constitute governing and those that qualify as politicking. *See generally* Anthony King, *Running Scared: Why America's Politicians Campaign Too Much and Govern Too Little* 73–91 (1997); Rita Kirk Whillock, *Political Empiricism: Communication Strategies in State and Regional Elections* 19–35 (1991). Politics and political considerations are inseparable from legislative activities. *See generally* Timothy E. Cook, *Making Laws & Making News* 103–17 (1989); Belle Zeller, *Pressure Politics in New York* 1–7 (1937).

### b. Political Considerations in Legislators' Staffing Decisions

The state legislature has authorized each member to hire a number of legislative aides. These assistants occupy positions that are necessarily political in nature. *See Ohrenstein,* 77 N.Y.2d at 47, 563 N.Y.S.2d 744, 565 N.E.2d 493 ("[A]lthough this distinction may be relevant to other

State employees, the line between political and governmental activities is not so easily drawn in cases dealing with legislators and their assistants."); *id.* ("Although [some] activities may be fairly characterized as political, as opposed to governmental, they are considered an *inherent part of the job of an elected representative and thus perfectly legitimate acts for a legislator or legislative assistant to perform.*" (emphasis added)); *see also* Alan Rosenthal, *Legislative Life: People, Process, and Performance in the States* 210 (1981) (legislative aides handle "political" work); *The Legislative Process in the United States, supra,* at 234 ("Some staff operations are almost exclusively 'political,' and require personnel with political expertise."). Loyalty to the advancement of legislators' political agendas and fortunes is the hallmark of employment in these positions. *See* Robert H. Salisbury & Kenneth A. Shepsle, *Congressman as Enterprise,* 6 Legis. Studies Q. 559, 573 (1981) ("[Legislators] work[ ] with and through associated staff personnel *who share an identity* and a set of goals not because of the payroll they are on, the office they work in, or the tasks they perform, but because of their *loyalty and commitment to the particular member.*" (emphases added)).

Because positions as legislative assistants are inherently political, considerations of loyalty to the views and agenda of the elected legislator are relevant in staffing. When it authorized these positions, the Assembly necessarily understood such considerations would factor into staffing decisions.

An extension of full First Amendment tenure to legislative aide's might well impede legislators' authority to base staffing decisions on appropriate political considerations. *See, e.g.,* Sydney H. Schanberg, *Gas Tax Cash and Re-Electing a Governor,* Newsday, Dec. 3, 1987 (New York State Senate aide forced to resign by State Senator after making statements linking Governor Cuomo to organized crime); *see also* Josh Zimmer, *FDLE Ends Look at*

*Harsh Letters,* St. Petersburg Times, Nov. 24, 1999 (Florida State House aide forced to resign by House Speaker after sending hostile letters on his own stationary and on his own time to various state leaders).

The centrality of these supportive positions to the overall operation of the legislature, as well as the need to allow political considerations as criteria for some employment, counsels against extending First Amendment tenure to members of a legislator's staff. *See, e.g., Gregory,* 501 U.S. at 463, 111 S.Ct. 2395 ("[T]he people of the States [retain the authority] to determine the qualifications of their most important government officials. It is an authority that lies at 'the heart of representative government.' It is a power reserved to the States under the Tenth Amendment and guaranteed them by that provision of the Constitution under which the United States 'guarantee[s] to every State in this Union a Republican Form of Government.' " (internal citations omitted)).

Questions of sound and fair employment practices are distinguishable from issues of constitutional law. Termination is often a counterproductive method of employee management. *See, e.g, Lewis v. Cowen,* 165 F.3d 154, 169 (2d Cir.1999) (concurrence). Some tolerance for differing views is desirable in any government office, including those of state legislators. *Id.* Importing sophisticated constitutional rules of free speech into the politically sensitive staffing decisions state legislators must make, however, is not the appropriate means to office equity and efficiency.

### 2. Representation
#### a. Early Theory

From the outset the American experience has been marked by concerns with the representation of the citizenry in government. The Revolution itself "was framed in terms of representational theory," particularly the controversy over the " 'virtual' representation" of the colonists in the British Parliament. Malcolm E. Jewell & Samuel C. Patterson, *The Legislative Process in the United States* 38

(1966) [hereinafter *Legislative Process in the United States* ]. Colonial representation in Parliament was highly attenuated with the colonists having no say over who represented their interests. Parliamentary leaders argued nonetheless that the colonists "had 'an equal share in the general representation of the Commons of Great Britain ... whether they had or had not particular representatives there.' " *Id.* at 38 (quoting George Grenville) (citations omitted); *see also* Hanna Fenichel Pitkin, *The Concept of Representation* 168–89 (1967) (Edmund Burke's theory of representation: "a representative is not to consult the wishes of his constituents; government is not to be conducted according to anyone's wishes."; representation is "something Parliament does for a nation as a whole. The duty of each member is to reason and judge about the good of the whole; the selfish wishes of parts of the nation, the wills of individual voters have nothing to do with it.").

Borrowing from the theories of John Locke, the Founders believed that a true representative government reserves to the people the choice of their own representatives. *See, e.g.,* John Locke, *Second Treatise of Government* § 222 (C.B. Macpherson ed., 1980) (6th ed. London 1764); *see also* Pitkin, *supra,* at 190–208 ("In America, representation was clearly to be of persons, and interests became an inevitable evil, to be tamed by a well-constructed government."); *see also The Federalist No. 10,* at 41 (J. Madison) (W.R. Brock ed., 1961).

They believed representatives should— at fixed intervals—be required to gain approval of the people. To ensure support, the representatives could be expected to remain responsive to the views of the people between elections. *See generally* Edmund S. Morgan, *Inventing the People: The Rise of Popular Sovereignty in England and America* 215–17 (1988); John Phillip Reid, *The Concept of Representation in the Age of the American Revolution* 85–95 (1989); Judith N. Shklar,

*American Citizenship: The Quest for Inclusion* 27 (1991).

The nature of this co-dependence was captured by James Madison in Federalist No. 37 when he wrote: "The genius of republican liberty seems to demand on one side not only that all power should be derived from the people, but that those entrusted with it should be kept in dependence on the people, by a short duration of their appointments . . . ." *Federalist No. 37,* at 234 (J. Madison) (W.R. Brock ed., 1961); *see Federalist No. 22,* at 110 (A.Hamilton) (W.R. Brock ed., 1961) ("The elective mode of obtaining rulers is the characteristic policy of republican government."; "The fabric of American empire ought to rest on the solid basis of *the consent of the People.*" (emphasis in original)). In fact, one-year terms for state legislators were employed during the period of Confederation as a means of ensuring the fidelity of legislators to voters' wishes. *See* Brendan Barnicle, Comment, *Congressional Term Limits: Unconstitutional by Initiative,* 67 Wash. L.Rev. 415, 416–17 (1992) ("[The early state constitutions] . . . imposed annual elections, and attempted to tie representatives closely to their constituents."); Nathan Alexander Sales, Note, *Classical Republicanism and the Fifth Amendment's "Public Use" Requirement,* 49 Duke L.J. 339, 353–54 (1999) ("In order to ensure the parity of interests between citizen and representative that was necessary for effective representation, states . . . typically provided for frequent elections." (footnotes omitted)); *see also* Gordon S. Wood, *The Creation of the American Republic, 1776–1787,* at 166 (1969) (all states except South Carolina provided for annual elections of legislators); *see generally* H. Trevor Colbourn, *The Lamp of Experience: Whig History and the Intellectual Origins of the American Revolution* 191 (1965).

b. Modern Practice

Since the time of the Founding, American notions of representation have continued to evolve, strengthening the essential nexus between voters and their legislators.

*See, e.g.,* Hanna Fenichel Pitkin, *The Concept of Representation, passim* (1967); *see also* Lisa O. Monaco, Comment, *Give the People What They Want: The Failure of "Responsive" Lawmaking,* 3 U. Chi. L. Sch. Roundtable 735, 740 (1996); *see generally* Richard F. Fenno, Jr., *Home Style: House Members in Their Districts, passim* (1978). The modern role of legislators centers less on the formal aspects of representing—e.g., legislating and policymaking—and more on maintaining the relationship between legislators and their constituents. This shift is primarily a result of voters' demands for assistance in dealing with a large bureaucratic government. *See* Malcolm E. Jewell, *Representation in State Legislatures* 10–18 (1982) [hereinafter *Representation in State Legislatures* ] (the meaning of modern representation); *cf.* Roger H. Davidson & Walter J. Oleszek, *Congress and Its Members* 5 (6th ed. 1998) ("Studies suggest that public officials and citizens view the twin functions of elected assemblies—lawmaking and representing—as separate, definable tasks.").

Essential to the success of modern representation is the maintenance of an ongoing dialogue between legislators and their constituents throughout the term of office. *See* Davidson & Oleszek, *supra,* at 8 ("From colonial times to the present, this country's voters have tended to prefer their lawmakers to be delegates, who listen carefully to constituents and follow their guidance."). This conversation operates to inform legislators of the views of voters and to ensure political accountability. It also provides a basis for intervention by legislators in the operation of the executive branch to protect the rights and interests of constituents. *See United States v. State of Vermont Agency of Natural Resources,* 162 F.3d 195, 225 (1998) (dissent) ("[Legislators], in their individual capacity and as members of [legislative] committees, frequently intervene on behalf of their . . . home communities to influence the policy positions and particular decisions of administrative agencies charged

with implementing ... statutes." (citations omitted)), *cert. granted,* —— U.S. ——, 119 S.Ct. 2391, 144 L.Ed.2d 792 (1999).

### i. Political Instruction

"Modern electorates, motivated by self-interest and schooled in democratic norms, [seem to] prefer *instructed delgates*—lawmakers who follow [their] instructions rather than exercise independent judgments." Davidson & Oleszek, *surpa,* at 133; *see also* William J. Keefe & Morris S. Ogul, *The American Legislative Process: Congress and the States* 30–31 (9th ed. 1997) ("[C]onstituents expect their representatives to pay close attention to them and to their districts.... The public's preferences are clear. Voters want their legislators to concentrate their attention on representing them and their districts."). Unclogged avenues of communication between constituents and legislators is essential to ensure that "legislators become thoroughly familiar with the needs and interests of the district, a requirement that cannot be met by waiting passively for mail or telephone calls." *Representation in State Legislatures, supra,* at 77. New modes of communication resulting from the on-going technological revolution—such as electronic mail and the internet—are enhancing the centrality of communication with constituents.

Providing voters and legislators with an outlet to express their views and concerns through legislator-constituent dialogue also reinforces democratic self-governance by promoting citizen participation. *See* Robert W. Bennett, *Democracy as Meaningful Conversation,* 14 Const. Comment. 481, 500 (1997) ("[T]he democratic conversation seems to be everywhere in the United States."); *id.* at 501 ("[T]he engagement of the electorate in the democratic conversation is an important cause of the stability of democracies, or at least of the United States' variant on the theme, a cause decidedly more important than the sense of involvement in majoritarian 'self-government' that comes from periodic candidate elections."). *But cf.* Michael J. Sandel, *Democracy's Discontent: America in Search of a Public Philosophy,* 85 Geo. L.J.2073, 2073 (1997) ("Most Americans do not believe they have much say in how they are governed and do not trust government to do the right thing.").

### ii Political Accountability

Elected representatives are expected to account for their views and votes to constituents on a regular basis. *See* Rosenthal, *supra,* at 102 ("[Legislators must] explain their activities—describing, interpreting, and justifying their behavior and their policy positions."); Davidson & Oleszek, *supra,* 134 (Legislators "will be called upon to explain their choices to constituents—no matter how many or how few people truly care about the matter."). As one commentator put it:

> The process of communication is an instrument of accountability. By reporting his activities and votes ..., the legislator is not only gaining publicity and building support but is also explaining what he has done and why. By making himself accessible to requests and questions from constituents, the legislator is practicing accountability. Communication is not only the instrument of accountability, but it is one of the responsibilities of the legislator. Constituents expect the legislator to be accessible, as well as to vote in their interest.

*Representation in State Legislatures, supra,* at 122; *see id.* (" 'The representative must act in such a way that there is no conflict [between the representative and the represented], or if it occurs an explanation is called for. He must not be found persistently at odds with the wishes of the represented without good reason in terms of their interest, without a good explanation of why their views are not in accord with their interest.' ... Nearly everything he does to win and hold support—allocating, reaching, presenting, responding, communicating, explaining, assuring—involves representation. It is a view of representation as politics[.]"). The frequent use of mailings and questionaires by legislators to all households in their dis-

trict is but one means of keeping up the legislators' end of the dialogue.

To be sure, all constituents will not hold the official accountable for every view expressed or vote cast. Nonetheless, most issues are at least of some concern to particular interests or segments of the constituency. The legislator, as the voters' agent in government, will likely be called to account for most policy views and legislative actions.

> It is often the organized groups in a district, more than individual constituents, who want an explanation of the legislator's [actions]. It is always important for legislators to stay in touch with the organized groups in the district, and explaining votes is one part of that process.

Malcolm E. Jewell & Penny M. Miller, *The Kentucky Legislature: Two Decades of Change* 86 (1988) [hereinafter *The Kentucky Legislature*]; *see also* Davidson & Oleszek, *supra*, at 109 ("[I]ssues motivate that segment of voters who are opinion leaders, who can lend or withhold support far beyond their single vote."); Rosenthal, *supra*, at 98 ("Well-organized groups in the district can make even the less salient issue important, simply because they care intensely about something. A group with membership and support in a member's district has electoral potential.").

Through communication and coordination with constituents, legislators are able to avoid loss of support and to gain public trust that may translate into influence with constituents on future issues. *See* Bruce E. Cain, John A. Ferejohn, & Morris P. Fiorina, *The Personal Vote: Constituency Service and Electoral Independence* 120 (1987); Jurgen Heideking, *The Pattern of American Modernity*, 129 Daedalus 219, 229 (2000) (describing James Madison's view of public opinion: "'As there are cases where the public opinion must be obeyed by the Government, so there are cases, where, not being fixed, it may be influenced by the Government.' The goal was a government 'deriving its energy from the will of the society, and operating by the reason of its measures, on the understanding and interest of the society.'" (citations omitted)); *cf.* Rosenthal, *supra*, at 101 ("[W]hat seems to matter more than policy linkages ... is that people have a sense that their representative is one of them, that he or she is not apart from them.").

A close continuing liaison provides legislators with the maneuvering room to take a position on a future issue contrary to strongly held views in the district without risking repudiation at the polls. *See id.* at 105; *see also* Glenn R. Parker & Suzanne L. Parker, *Correlates and Effects of Attention to Districts by U.S. House Members, in New Perspectives on the House of Representatives* 53, 56 (Robert L. Peabody & Nelson W. Polsby eds., 1992) ("district attentiveness may be one way in which the representative secures policy leeway in Congress: the member cultivates the district and by doing so increases citizen trust."). Squandering of that trust by misrepresentation or misperception of a legislator's views, resulting in unnecessary conflict with voters, is to be avoided. *See* Malcolm E. Jewell & Samuel C. Patterson, *The Legislative Process in the United States* 12 (1966) [hereinafter *The Legislative Process in the United States*] ("Groups that are dissatisfied with the way in which conflicts have been resolved [in the political system] may become alienated from the system and unwilling to accept the political decisions emanating from it.").

In short, legislators must "explain their views and actions to" constituents and this requires an effective, undistorted "two-way process" of communication. *Representation in State Legislatures, supra*, at 18.

### c. Staff Speech and Constituent Relations

Maintaining a clear voice between legislators and constituents is a significant government interest, warranting restrictions on the speech of political aides where that speech may create misperceptions about legislators' views. *See Representation in State Legislatures, supra*, at 18 (effective two-way communication between constitu-

ents and elected officials is an "essential part" of representation); *cf. Bond v. Floyd,* 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) ("The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy."); *cf. generally Rankin v. McPherson,* 483 U.S. 378, 400, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (Scalia, J., dissenting) ("A public employer has a strong interest in preserving its reputation with the public.").

### i. Staff Speech

Controversial public statements of legislative staffers can distort the channels of communication between legislators and constituents. Elected officials—due to time constraints and the pressures of the office—must often rely on their aides as surrogates speaking on their behalf. *See, e.g., Representation in State Legislatures, supra,* at 186 ("One reason legislators want personal staff is because the lack the time to fulfill the demands made on them."); *The Kentucky Legislature, supra,* at 94 (personal staff are used for constituency communication by legislators in many states); William J. Keefe & Morris S. Ogul, *The American Legislative Process: Congress and the States* 36 (9th ed.1997) (personal stafffers are "an important element in each [legislator's] design for increasing visibility and support"); *The Legislative Process in the United States, supra,* at 236 ("[S]taff serve as an important communications link between the [legislator] . . . and constituents.").

The close affiliation of aides and the legislators they serve generates a strong public perception of association between the two. This naturally leads the public to assume their views are identical.

As a result, what legislative aides say may reasonably be understood by voters as an expression of the legislator's position. Even where a legislative assistant affirmatively states that a particular statement is made in a personal capacity, constituents may nonetheless perceive that the views of the aide were sanctioned by the legislator. *Cf. Nixon v. Shrink Missouri Government PAC,* —— U.S. at ——, 120 S.Ct. at 908 (public perception of corrupting influence of campaign contributions overrides First Amendment speech rights in making campaign contributions); *Buckley v. Valeo,* 424 U.S. 1, 30, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (interest "in safeguarding against the *appearance* of impropreity" is a substantial basis for curtailing First Amendment speech rights in making campaign contributions (emphasis added)). The result is that legislators may mistakenly be held accountable for the speech of their political staffers.

### ii Legislators' Counterspeech

Counterspeech is one remedy legislators have available to correct such misperceptions. *Cf. New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (public officials enjoy access to the channels of communication to counteract false statements).

Practical considerations counsel against forcing legislators to rely on denials as their only remedy, however. First, state legislators operate at the heart of the state government, exercising the broadest powers that can be delegated by the people. Requiring them to devote their time and resources to disavowing and disassociating themselves from an aide's potentially damaging public comments will impede performance of legislative duties and tax already limited resources. *See generally* Fenno, *supra,* at 34 ("Time is a House member's scarcest and most precious political resource. If there is an exemplary congressional complaint, surely 'there isn't enough time' must be it. . . . [Representatives] must choose and trade off."); *cf. generally* Thomas E. Cavanagh, *The Two Arenas of Congress, in The House at Work* 55, 71 (Joseph Cooper & G. Calvin Mackenzie eds., 1981) [hereinafter *The House at Work* ] ("The effectiveness of congressional performance is a direct consequence of the members' allocation of their limited resources of time and staff."). Such a drain

on legislators' resources is particularly undesirable since the employment of legislative assistants in the first place is largely a response to the growing pressures, responsibilities and time constraints facing state representatives. *See, e.g., Representation in State Legislatures, supra,* at 182–83 ("State legislatures have been in a stage of transition. Twenty years ago, in all but the largest states, the legislatures—and their members—were almost invisible, meeting for a few months every two years and then disappearing from public view.... The longer sessions, greater interim activity, increased staffing, and other trends have enhanced the importance and increased the visible activity of the legislature as an institution."); Harrison W. Fox, Jr. & Susan Webb Hammond, *Congressional Staffs: The Invisible Force in American Lawmaking* 88 (1977) ("Increases in legislative workload and constituent demands in the last twenty years have been partially responsible for the growing reliance on staff."); *see also id.* at 188 ("The demands on state legislatures are likely to become greater and more difficult to reconcile as issues become more complex. This means that individual legislators will face more difficult pressures at the same time they are acquiring more assistance and resources and the job of being a legislator is gaining more importance."); Rosenthal, *supra,* at 106 ("[District staff are intended] to 'reflect into the community the presence of the legislator,' even though he may be absent from the district for months at a time." (quoting the *California District Office Manual,* March 1977)).

Second, even when the legislator disavows the aide's public comments, constituent pressure may nonetheless build for dismissal. *See also* Michael Wines, *So Many Minds To Be Changed, So Little Time,* N.Y. Times, September 11, 1994, § 4, at 1 ("Sacking the staff is Washington's folk remedy for the pain of inflamed public opinion."); *cf.* Susan Webb Hammond, *The Management of Legislative Offices, in The House at Work, supra,* at 184 ("[T]he legislative office units are political

entities. Members must face election every two years. The concerns and needs of their constituents are of continuing concern. They must respond to their electorates .... Loyalty, trust, and the accountability of aides to the principal employer are key elements."). The inability of legislators to respond to this pressure may undermine their effectiveness in other legislative activities because of reduced public support and confidence.

### iii. Termination

When, as here, the government is acting in its capacity as employer and not sovereign, and when the asserted interest is as substantial as preserving the integrity of the legislator-citizen relationship, the ability to discharge must be an available remedy. *See Waters,* 511 U.S. at 673 ("[G]reater deference [is due] to government predictions of harm used to justify restriction of employment speech than to predictions of harm used to justify restrictions on the speech of the public at large."); *cf. Nixon v. Shrink Missouri Government PAC,* —— U.S. ——, ——, 120 S.Ct. 897, 911, 145 L.Ed.2d 886 (2000) (Breyer, J.) (compelling government interest in preserving integrity of electoral process); *Burson v. Freeman,* 504 U.S. 191 208–09, 112 S.Ct. 1846, 119 L.Ed.2d 5 (plurality opinion) (same); *New York Times,* 376 U.S. at 254, 84 S.Ct. 710 (challenged speech restriction imposed in government's capacity as sovereign, not employer; asserted interest was protection of public official's reputation, not protection of legislator-constituent relationship); *Klug v. Chicago School Bd. of Trustees,* 197 F.3d 853, 858 (7th Cir.1999) (broader speech restrictions allowed when imposed by government as employer and not as sovereign).

The authority to discharge close political aides for public speech is supported by several practical considerations. First, only a small fraction of state employees will hold jobs for which their speech can burden the representative process. Second, those who accept these jobs do so

with the understanding that their personal conduct—including their speech which threatens the political interests or constituent relations of the elected official—can be a legitimate basis for dismissal. *See, e.g., Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 139 (2d Cir. 1999) ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." (quoting *Rankin v. McPherson*, 483 U.S. 378, 390, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987))).

On balance, the negligible chilling effect on free speech which may result by permitting legislators to dismiss political aides for their public comments is substantially outweighed by potential benefits in the effective operation of the state legislature and in the representative process generally. To accord non-clerical legislative aides holding politically sensitive positions First Amendment tenure for their public speech is unwarranted.

### C. Related First Amendment Doctrines

Plaintiff and defendant have argued that the constitutionality of plaintiff's dismissal is governed by two existing strands of First Amendment jurisprudence.

The first set of cases governs a public employers ability to take an adverse employment action against a public employee for speaking out on matters of public concern. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Bd. of Ed.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The second set involves a public employer's ability to terminate a public employee based on political affiliation—so-called "patronage" dismissals. *See, e.g., Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion).

Although the distinction between these two lines is "frequently treated as one between political patronage and employee speech (or, alternatively, political affiliation and political expression), the line is not so stark." *Heideman v. Wirsing*, 7 F.3d 659, 662 (7th Cir.1993); *see generally* Craig D. Singer, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Affiliation*, 59 U. Chi. L.Rev. 897 (1992). Rather, the two strands are more appropriately distinguished by "the manner in which the exercise of an employee's public speech may impede" the proper functioning of the government. *Heideman*, 7 F.3d at 662. *But see generally Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir.1999) ("Where the discharge is based on discrete incidents of speech rather than political affiliation, *Pickering*, not *Branti* and *Elrod*, provides the appropriate framework of analysis.").

#### 1. Pickering

In *Pickering v. Bd. of Education*, the Supreme Court delineated the constitutional restraints that exist on public employers ability to terminate employees for speech. It established the *Pickering* balancing test: the public employer's asserted interests are balanced against the speech interests of the employee.

*Pickering* itself involved the rather innocuous situation of a public school teacher who was terminated for publishing a letter in the local newspaper criticizing the school board and local superintendent's allocation of financial resources between educational and athletic programs. *See id.* at 566, 88 S.Ct. 1731. Observing that the teacher's comments did not impede the "proper performance of his daily duties in the classroom" or "the regular operation of the schools generally," *id.* at 572–73, 88 S.Ct. 1731, the Court held that the separation from public employment unconstitutionally infringed free speech, *see id.* at 574, 88 S.Ct. 1731. The Court's reasoning and holding turned in substantial measure on the looseness of the ties of personal

loyalty between teachers and the Board. A teachers "employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of *close working relationships* for which it can persuasively be claimed that *personal loyalty* and *confidence* are necessary to their proper functioning." *Id.* at 570, 88 S.Ct. 1731 (emphases added). It was appropriate for the teacher to speak out while school policy was being made; failing to carry out policy once it was settled would have been a different matter.

Since *Pickering*, the courts have refined the balancing test. In *Connick v. Myers*, the Supreme Court generally restricted the reach of the First Amendment in the public employment context to speech involving issues of public concern. 461 U.S. at 146, 103 S.Ct. 1684. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.*

*Connick* emphasized that the purpose of the *Pickering* balancing test is to ensure the "effective and efficient fulfillment of [the government's] responsibilities to the public." *Id.* at 150, 103 S.Ct. 1684. "To this end, the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Id.* at 151, 103 S.Ct. 1684. Particularly relevant to this concern is the nature of the employment relationships which would be jeopardized by the speech: "when close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id.* at 151–52, 103 S.Ct. 1684. The Court in *Connick* cautioned that the more substantial the public concern underlying the speech, the greater the government's interest must be to justify adverse employment action. *See id.* at 152, 103 S.Ct. 1684.

In *Rankin v. McPherson*, the Supreme Court reiterated that *Pickering* balancing requires a consideration of the internal administrative and staffing problems which may impede the government's ability to efficiently carry out public services. 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

> We have previously recognized as pertinent considerations [in the *Pickering* balancing] whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise. These considerations, and indeed the very nature of the balancing test, make apparent that the state interest element of the test focuses on the *effective functioning of the public employer's enterprise.*

*Id.* at 388, 107 S.Ct. 2891 (emphasis added).

The thrust of the government's interest justifying the balancing is efficient delivery of government services which may be jeopardized by administrative and staffing problems arising from public speech. *See Connick*, 461 U.S. at 150, 103 S.Ct. 1684 ("The *Pickering* balance requires full consideration of the government's interest in the *effective and efficient fulfillment of its responsibilities to the public.*" (emphasis added)); *see, e.g., Morris v. Lindau*, 196 F.3d 102, 109 (2d Cir.1999) ("[The Court in *Pickering*] recognized that the state has an interest as an employer in regulating speech by employees so as to promote the efficiency of public services performed by its employees."); *Scott v. Meyers*, 191 F.3d 82, 86–87 (2d Cir.1999) ("[The *Pickering*] test requires us to balance 'the interests of the [employee], as citizen, in commenting upon matters of public concern and the interests of the State, as an employer, in promoting the efficiency of the public services it performs through its employ-

ees.' "); *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278–79 (2d Cir.1999) ("The competing interests that must be balanced are the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."); *Jones v. Collins*, 132 F.3d 1048, 1053 (5th Cir.1998) ("[T]he employee's interest in "commenting upon matters of public concern" must outweigh the public employer's interest "in promoting the efficiency of the public services it performs through its employees.").

### 2. *Elrod*

In *Elrod v. Burns*, the Supreme Court addressed the constitutionality of patronage dismissals. 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). It identified several constitutional limitations warranting heightened scrutiny of political patronage. First was the restraint it places on the First Amendment "freedoms of belief and association." *Id.* at 355, 96 S.Ct. 2673. The threat of dismissal from public employment for exercising these First Amendment rights has a potent chilling effect. "An individual who is a member of the out-party maintains affiliation with his own party at the risk of losing his job. He works for the election of his party's candidates and espouses its policies at the same risk." *Id.*

Political patronage discharges also pose a threat to the "free functioning of the electoral process." *Id.* Taking a practical view of the political process, the Court stated that political patronage can be abused by the political party or coalition in control of the government "to starve political opposition by commanding partisan support, financial and otherwise." *Id.*

Conditioning public employment on partisan ,support prevents support of competing political interests. Existing employees are deterred from such support, as well as the multitude seeking jobs.... Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant.

*Id.*

In contrast to the reasoning underlying the *Pickering* line of cases, the Court rejected government efficiency rationales for political patronage. The petitioner, a county government, advanced the argument that "employees of political persuasions not the same as that of the party in control of public office will not have the incentive to work effectively and may even be motivated to subvert the incumbent administration's efforts to govern effectively." *Id.* at 364, 96 S.Ct. 2673. Refusing to accept this argument, the Court reasoned that "it is doubtful that the mere difference of political persuasion motivates poor performance" and that, therefore, "mere political association is an inadequate basis for imputing disposition to ill-willed conduct." *Id.*

Although rejecting efficiency as a basis for patronage dismissals, the Court conceded that political loyalty grounded in a concern for responsive and effective "representative government" could be a basis for "a narrow category of patronage dismissals." *Id.* at 367, 96 S.Ct. 2673 ("A second interest advanced in support of patronage is the need for *political loyalty* of employees, not to the end that effectiveness and efficiency be insured, but *to the end that representative government not be undercut* by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." (emphasis added)). The Court concluded that "[l]imiting patronage dismissals to policymaking positions is sufficient to achieve this governmental end." *Id.; see, e.g., Flynn v. City of Boston*, 140 F.3d 42, 46 (1st Cir.1998) ("[T]o implement their mandates, elected officials need a cadre of agency leaders and top subordinates responsive to the elected officials' goals. A rule effectively preventing the replacement of senior officials by new administrations would be a very serious step.

A legislature can provide such tenure, but the Constitution does not command it."); *Roman Melendez v. Inclan,* 826 F.2d 130, 132 (1st Cir.1987) ("[R]epresentative government needs a certain amount of leeway for partisan selection of agents in order to work.").

*Branti v. Finkel* tightened the means-ends fit for patronage dismissals. 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). It declared that, "[u]nder some circumstances, a position may be appropriately considered political even though it is neither confidential nor policymaking in character," and went on to acknowledge that it "is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position." *Id.* The Court shifted from an emphasis on whether the employee was a "policymaker" to "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518, 100 S.Ct. 1287.

### 3. Legislators' Concerns

While the present case does not fit comfortably within either of these free speech lines as they are currently fashioned, *Elrod*'s categorical approach rather than *Pickering*'s balancing seems more appropriate to control dismissals of legislators' political aides.

#### a. *Pickering*'s Balancing

The *Pickering* balancing analysis—and the resulting restriction on speech—is justified by government efficiency considerations. As already noted, the ultimate concern is whether the government's provision of services to the public will be jeopardized by the speech. *See, e.g., Swineford v. Snyder County,* 15 F.3d 1258, 1270 (3d. Cir.1994) ("[*Pickering* test] requires balancing the public employee's interests in commenting on matters of public concern against the public employer's interests in efficiency.").

Belief that constituent relations of a legislator may be jeopardized presents different considerations. Speech of a political aide that threatens the public's relationship with or confidence in an elected official will not demonstrably impact efficient administration or provision of government services. *Cf. People v. Ohrenstein,* 77 N.Y.2d 38, 46, 563 N.Y.S.2d 744, 565 N.E.2d 493 (1990) (noting legislative aides stand apart from "[s]tate employees generally" because of "the nature of the Legislature's function"). Thus, the underlying interest justifying the *Pickering* analysis is not at issue when a legislator takes an adverse employment action against a political assistant whose public comments threaten political interests or constituent relations.

Moreover, balancing would lead to an inappropriate judicial intrusion where political considerations are at issue. *Pickering* necessitates judicial inquiry into the likely harm flowing from the particular speech. *See, e.g., McEvoy v. Spencer,* 124 F.3d 92, 98 (2d Cir.1997) ("Specifically, a court must assess the extent of the disruption caused by the employee's speech on workplace discipline, harmony among coworkers, working relationships, and the employee's job performance, and determine whether the disruption justifies the employer's attempt to stifle the employee's expressive activity."); *see also Brewster v. Bd. of Educ.,* 149 F.3d 971, 979–80 (9th Cir.1998) ("under *Pickering,* the determination of whether an employee's expression is constitutionally protected requires a *fact-sensitive, context-specific balancing*" (emphasis added)); *see generally* Lawrence Rosenthal, *Permissible Content Discrimination Under the First Amendment: The Strange Case of the Public Employee,* 25 Hastings Const. L.Q. 529, 531 (1998) (*Pickering* balancing is imprecise and vague causing a "chilling effect" on public employee speech).

Requiring a balancing inquiry measuring the particular speech against the resulting political harm to the legislator's constituent relations would send the courts into a political minefield. *See generally* James Kimmell, Jr., Note, *Politics and the Non–*

*Civil Service Public Employee: A Categorical Approach to First Amendment Protection,* 85 Colum. L.Rev. 558, 566–72 (1985) (criticizing *Pickering* balancing approach); *cf. generally Lewis v. Cowen,* 165 F.3d 154, 167–69 (1999) (concurrence). *Pickering* would require courts to evaluate the complex and highly sensitive electoral calculations faced by legislators. *See Moran v. State of Washington,* 147 F.3d 839, 848 (9th Cir.1998) ("[T]he very point of the *Pickering* balancing test is to weigh the value of the speech that causes the disruption *against the harm of the disruption that is caused, either directly or indirectly, by the speech.*" (emphasis added)). Federal courts are the *least appropriate* institution to make such overtly political assessments of the state legislative process. Such an intrusion would be rightly resented by state legislators as a perversion of state-federal relations and of separation of powers.

The dilemma cannot be resolved by partial deference to the elected official's judgment with respect to whether the political aide's public statements threaten constituent relations. *Cf. Heil v. Santoro,* 147 F.3d 103, 108 (2d Cir.1998) ("[A] government employer's reasonable predictions of disruption are entitled to 'substantial weight even when the speech involved is on a matter of public concern.'" (quoting *Waters,* 511 U.S. at 673, 114 S.Ct. 1878)); *Shahar v. Bowers,* 114 F.3d 1097, 1104 n. 15 (11th Cir.1997) (en banc) (noting that *Pickering* balancing requires "greater deference" for employment decisions of certain government employers). *Pickering* balancing requires the government to make ever greater showings of harm as the speech takes on more significant tones of public concern. *See, e.g., Jeffries v. Harleston,* 52 F.3d 9, 13 (2d Cir.1995) ("[T]he closer the employee's speech reflects on matters of public concern, the greater must be the employer's showing that the speech is likely to be disruptive before it may be punished."). Speech of legislative aides that is likely to have negative electoral repercussions is also likely to be of the greatest public concern. As a result, any meaningful adherence to *Pickering* balancing would—in the absence of blind deference—still require the courts to make wholly inappropriate political calculations.

b. *Elrod*'s Job Classification

The underlying government interest advanced in *Elrod* to justify limited patronage dismissals is—in a broad sense—a concern for the proper functioning of representative government. It is axiomatic that today a viable and robust representative system of government requires that elected officials respond—within constitutional limits—to the political views and policy desires of voters.

In this vein, newly elected officials, having received a fresh mandate from the electorate, are entitled to flexibility in hiring key political assistants who share their visions so that the electoral directives can be converted from campaign platitudes to working policies. As the court of appeals for the Second Circuit put it:

> There is no likely circumstance in which a shared ideology is more important than when an elected official appoints a deputy who may act in his or her stead. Elected officials are charged with carrying forth the mandate of the voting public, and in order to effectuate the policies promised the electorate, that official must be able to have trusted advisors and alternates who are directly accountable to that official.

*Regan v. Boogertman,* 984 F.2d 577, 580 (2d Cir.1993).

To be sure, the interest in securing clear communication linkages between legislators and constituents differs somewhat from the government interest asserted in *Elrod* for patronage dismissals. *See Hall v. Ford,* 856 F.2d 255, 263 (D.C.Cir.1988) (Buckley, J.) (patronage dismissal cases do provide "a helpful insight into the employee speech cases" involving "high-level officials"). *Elrod* in its strictest sense focuses on the conversion of the "election-day" priorities of the voters to public policy. *See McEvoy v. Spencer,* 124 F.3d 92, 99 n. 4

(2d Cir.1997) ("*[E]lrod* is applicable so long as [the discharge motivated by expressive conduct] *occurred during a political contest* of some sort." (emphasis added)); *Hall*, 856 F.2d at 263 ("The affiliation cases arise in a discrete context . . . , *the hurlyburly of elections and their aftermath* " (emphasis added)).

An effective representative democracy requires more than post-election day shifts in policy. *See supra* Part III.B.2.b. Particularly in the age of the internet, mass media, and public polling, legislators must maintain a continuing sensitivity to the views, demands, values, and concerns of their electorates. To do so requires a continuing and robust dialogue between legislators and their constituents.

When considered in this broader sense, the reasoning supporting limited patronage dismissals in *Elrod* is in harmony with the interest in ensuring that state legislators maintain an on-going, unhindered and comprehensive dialogue with their constituents between election campaigns. It is the *Elrod* line, therefore, that provides the more appropriate analytical framework for analyzing the case at hand. *Cf.* Kimmell, *supra*, at 569–72 (advantages of categorical approach over ad hoc balancing).

### D. First Amendment Protection for Staff Speech

■ The Court in *Elrod* adopted a categorical approach, identifying classes of jobs which are not entitled to First Amendment protection from dismissals. As modified by the Court in *Branti*, dismissal of government employees based on political beliefs or association is constitutional so long as party affiliation is an appropriate requirement for the job in question. *Branti*, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The ultimate inquiry is whether the "position may be appropriately considered political." *Id.*

Permitting dismissals based on electoral concerns for a narrow category of legislative-related jobs is the appropriate means—particularly in light of the func-

tional limitations on the courts' inquiring into purely political matters—for reconciling the free speech interests of legislative aides with the interest in effective legislative representation. *Cf. Nixon v. United States*, 506 U.S. 224, 252–53, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (Souter, J., concurring) (separation-of-powers doctrine prevents " 'inappropriate interference in the business of the other branches of Government' " and requires "respect . . . [for] the political departments" (citations omitted)). Staffers holding positions that are so connected to a legislator's lawmaking and representation roles that constituents might reasonably associate their speech for that of the legislator's are not entitled to First Amendment protection from dismissal where political interests and constituent relations are at issue. *But cf. generally Barnard v. Jackson County*, 43 F.3d 1218, 1223–25 (8th Cir.1995) (county legislative auditor leaked sensitive information to the press; *Pickering* balancing test applied to government's interest in ensuring "close harmony" between the auditor and the county legislature).

For this small category of legislative jobs, "refusing to grant First Amendment found tenure would seem to take away little freedom not already lost in accepting the appointment itself." *Gonzalez v. Benavides*, 712 F.2d 142, 148 (5th Cir.1983); *see also Shahar v. Bowers*, 114 F.3d 1097, 1105–06 (11th Cir.1997) (en banc) (high-level employees must "appreciate the importance of appearances and the need to avoid bringing 'controversy' to their Department"). It hardly seems defensible to shield these aides with First Amendment tenure when their public pronouncements may jeopardize the tenure of the elected officials at whose pleasure and for whose assistance they serve. Their "selection presumably included that supposition [of lack of First Amendment protection]. To say that loss of th[eir] job is the price for [their] public declaration chills little." *Id.*

To summarize, legislative aides occupying positions in which their public speech

may reasonably be associated with, or mistaken for, that of the legislator's may constitutionally be dismissed for their public speech. *See, e.g., Sims v. Metropolitan Dade County,* 972 F.2d 1230, 1236 (11th Cir.1992) ("It is clear that the First Amendment does not provide a right to continued government employment in a capacity that is inconsistent with, and undermined by, one's off-duty expressive conduct."). This rule applies even if the speech falls outside of the aide's public responsibilities. It is the perceived personal connection between legislator and staffer, and the legislator's resulting concern for his constituent relations, that is critical. *But see Adler v. Pataki,* 185 F.3d 35, 45 (2d Cir.1999) ("If *simple vindictiveness* against the plaintiff ... was the defendants' true motive, a First Amendment violation would be established.").

## IV APPLICATION OF LAW TO FACTS

### A. Federal Claims

■ Considering plaintiff's factual allegations and all reasonable inferences that can be drawn in her favor from them, dismissal of the speech and association claims brought under section 1983 is required. *See Brass v. American Film Techs.,* Inc., 987 F.2d 142, 150 (2d Cir. 1993); *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). " '[I]t is clear that no relief could be granted under any set of facts that could be proved consistent with [plaintiff's] allegations[.]' " *H.J. Inc. v. Northwestern Bell Telephone Company,* 492 U.S. 229 at 249–50, 109 S.Ct. 2893 (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *see also Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980).

Gordon was terminated for her public comments on alleged police brutality at a public rally and press conference within the Assemblyman's district. At the time of the termination Assemblyman Griffith told Gordon that she "went against the [police] officers," and that "[t]hey are my friends." Compl. ¶ 27. He then tele-

phoned the police inspector to apologize for Gordon's participation and to inform him that Gordon would be terminated for her participation. The natural inference to be drawn from these actions is that Assemblyman Griffith was acting to protect his relationship with local police officers and with his electorate generally. By terminating Gordon, he publicly disassociated himself from her comments in an attempt to undo the political damage he believed—whether correctly or not—she had caused. *See, e.g., Representation in State Legislatures, supra,* at 133 (legislators balance competing views within the constituency).

Gordon's legislative job was one in which her public comments could reasonably be understood to reflect the views or, at a minimum, the sympathies of Assemblyman Griffith. She was the Assemblyman's Community Relations Director. She represented him to his constituents in the legislative district. She essentially operated as his alter-ego within the district, speaking to and acting for constituents on his behalf. *See, e.g.,* Compl. ¶ 10. This is precisely the kind of position which would lead constituents to assume the legislator agrees, or is at least sympathetic, with the staffer's speech. Plaintiff is not entitled to constitutional protection from dismissal for her participation and speech in the May 5, 1999 protest and press conference.

The motion to dismiss with respect to the speech and association claims brought pursuant to section 1983 is granted.

### B. State Claims

Dismissal of the federal claims at the pleadings stage makes exercise of pendent jurisdiction in this politically sensitive case undesirable. *See* 28 U.S.C. § 1367(c)(3) ("The district courts *may* decline to exercise supplemental jurisdiction over a [state law claim] if the district court has dismissed all claims over which it has original jurisdiction." (emphasis added)); *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)

("When the single federal-law claim in the action was eliminated at an early stage of the litigation, the District Court had a powerful reason to choose not to continue to exercise jurisdiction.").

The state law claims are dismissed.

## V CONCLUSION

The federal claims brought pursuant to section 1983 of Title 42 alleging constitutional violations are dismissed. Plaintiff has failed state a claim upon which relief can be granted. Exercise of jurisdiction over the pendent state law claims is declined.

Upon argument of the motion to dismiss it became apparent that the complaint accurately stated the controlling facts so that allowing an amendment of the pleading or permitting further discovery would serve no useful purpose.

No costs or disbursements are to be paid by the plaintiff given the absence of governing precedent.

SO ORDERED.